THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. AILEEN CARTIER; THE COMMONWEALTH OF MASSACHUSETTS, EX REL. AILEEN CARTIER; AND THE STATE OF RHODE ISLAND, EX. REL. AILEEN CARTIER, | § § § § § § § § | Filed in Camera and Under Seal<br><br>THE RELATOR'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |
| Plaintiff-Relator, | § § § | Pursuant to 31 U.S.C. § 3730(B)(2); M.G.L. C. 12, §§ 5A-5O; |
| v. | § § | and R.I. Gen. Laws §§ 9-1.1-1 through 9-1.1-8 |
| CAREWELL URGENT CARE CENTERS OF MA, P.C.; CAREWELL URGENT CARE OF RHODE ISLAND, P.C. (hereinafter referred to as "CAREWELL"); and URGENT CARE CENTERS OF NEW ENGLAND, INC. (hereinafter referred to as "URGENT CARE CENTERS OF NEW ENGLAND"), | § § § § § § § § § § | Civil Action No. <u>16cv12572</u><br><br>DO NOT PLACE ON PACER DO NOT SERVE DEFENDANTS DO NOT PLACE IN PRESS BOX |
| Defendants. | § § | |

## I. SUMMARY OF CLAIM

1.       This is an action against Defendants CareWell Urgent Care Centers of MA, P.C.,

CareWell Urgent Care of Rhode Island, P.C., and Urgent Care Centers of New England, Inc. to

recover treble damages and civil penalties under the federal False Claims Act, 31 U.S.C.

Sections 3729-33; the Massachusetts False Claims Act, M.G.L. C. 12, §§ 5A-5O; and the Rhode

Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 through 9-1.1-8, arising out of Defendants'

knowing violations of the FCA.

2.    As more fully alleged herein, this action arises out of the Defendants' continuing schemes to defraud the United States of America, the Commonwealth of Massachusetts and the State of Rhode Island through the submission of false and fraudulent claims for payment for services in urgent care facilities to Medicare, Medicaid, and other federal health care programs ("collectively, the government").

3.    The schemes date back to at least 2013 and are ongoing.

4.    Claims were false and fraudulent because they were for urgent care services that were unreasonable, unnecessary, or that simply did not occur as the Defendants reported them to have occurred.

5.    Specifically, Defendants, acting jointly and/or through each other's agency, provided Evaluation and Management (E/M) services to patients that were unrelated to their individual medical needs, but rather for the purpose of "upcoding" the level of services to obtain the highest levels of Medicare and Medicaid reimbursements. The Defendants' management required that all patients receive a "limited complete" history and physical exam, even when the patients' chief complaint did not warrant it. Requiring that all patients receive a medically unnecessary complete history and physical exam automatically bumps up the E/M level billed for the visit, which in turn yields higher reimbursement levels from Medicare and Medicaid. This is directly contrary to Medicare regulations which clearly state that "medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted."

6. The Defendants presumptively upcoded the level of service of **a substantial number of** patients either from a level 2 to a level 3, or from a level 3 to a level 4, or from a level 2 to a level 4, rather than relying on individualized patient medical history, examination and complexity of the medical decision making to determine the level of care most suited to each patient's clinical needs. The difference in reimbursement between the different levels is set forth in paragraphs 58 and 95 herein.

7. The Defendants billed for higher levels of evaluation and management services than were documented to have been delivered to the patients. The patient records show that the Defendants billed for a service level without complying with the Medicare and Medicaid documentation requirements for the history, examination and decision-making components of the CPT code billed. This is contrary to Medicare regulations which state that "to bill the highest levels of visit codes, the services furnished must meet the definition of the code." Three components (history, examination and medical decision-making) primarily determine the CPT code appropriate for the visit. Medicare regulations require that certain requirements be met within each of the three components. The Defendants failed to meet these requirements when billing a certain level. For example, the Defendants billed a new patient visit as a level 4 (99204) without documenting the review of ten (10) body systems or the examination of nine (9) organ systems during the visit.

8. The Defendants added a Modifier -25 for services that were not "significant, separately identifiable" evaluation and management service above and beyond the other service provided or beyond the usual pre-operative and post-operative care associated with the procedure that was performed. The Defendants added a Modifier -25 to laboratory tests and x-rays, even

when such services were consistent with what is normally performed during the type of visit required by the patient.

## II.   JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction under 28 U.S.C Sec. 1345.

10.    The Court may exercise personal jurisdiction over the Defendants, and the venue is appropriate in this Court, under 31 U.S.C. Sec. 3732(a) and 28 U.S.C. Sec.1391(b), because CareWell Urgent Care Centers of Massachusetts, CareWell Urgent Care of Rhode Island, and Urgent Care Centers of New England transact business in this District and caused the submission of false claims in this District. Any action under Sec. 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by Sec. 3729 occurred.

## III.   FILING UNDER SEAL

11.    Under the Act, this First Amended Complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.

12.    As required by the FCA, Relator voluntarily submitted prior to the filing of the Complaint, a confidential pre-filing disclosure statement (subject to the attorney-client, work-product and common-interest privileges) to the United States Government, the Commonwealth of Massachusetts and the State of Rhode Island.

## IV.   PARTIES

13.    The real parties in interest as plaintiffs are the United States of America, the Commonwealth of Massachusetts, and the State of Rhode Island.

## A. The Relator

14.     Relator Aileen Cartier (hereinafter referred to as "Relator Cartier") is a resident of the Commonwealth of Massachusetts and is a Registered Family Nurse Practitioner, licensed in Massachusetts, California and New Mexico. Relator Cartier began working for CareWell as a per-diem Nurse Practitioner in May of 2016 and became a full-time employee in July of 2016. She also currently works as a Nurse Practitioner for Reliant Medical Group, in an urgent care facility in Worcester, MA.

## B. The Defendants

### B.1. Defendant CareWell Urgent Care Centers of MA, P.C.

15.     Defendant CareWell Urgent Care Centers of MA, P.C. is headquartered at 2 Adams Pl., Suite 305, Quincy, MA and was founded in May of 2012. It was initially known as Shackelford Medical Group of Massachusetts, P.C. When founded, Dr. John H. Shackelford was the company's President and Director and Denise Esselburn was the company's Treasurer and Secretary.

16.     In March of 2013, the company's name was changed to CareWell Urgent Care Centers of MA, P.C. At that time, John M. Cornwell, MD became the company's President and Director. Denise Esselburn remained as the company's Treasurer and Secretary.

17.     On or about December of 2013, James Berry replaced Denise Esselburn as the as the company's Treasurer and Secretary.

18.     On or about December of 2015, James Jarrett replaced James Berry as the company's Treasurer and Secretary. Currently, John M. Cornwell, MD also serves as the company's Regional Medical Director.

19.     The company currently operates sixteen (16) urgent care centers across Massachusetts. According to its website, CareWell plans to open a new urgent care center on 1088 Fall River Avenue, Seekonk, MA 02771. This would make seventeen (17) total facilities in Massachusetts.

   a.  CareWell Urgent Care Billerica is located at 510 Boston Rd., Billerica, MA 01821.

   b.  CareWell Urgent Care Cambridge Fresh Pond is located at 601 Concord Ave., Cambridge, MA 02138.

   c.  CareWell Urgent Care Cambridge Inman is located at 1400 Cambridge St., Cambridge, MA 02138.

   d.  Cambridge Urgent care Fitchburg is located at 380 John Fitch Hwy., Fitchburg, MA 01420.

   e.  CareWell Urgent Care Framingham is located at 50 Worcester Rd. #3, Framingham, MA 01702.

   f.  CareWell Urgent Care Lexington is located at 58 Bedford St., Lexington, MA 02420.

   g.  CareWell Urgent Care Marlborough is located at 757 Boston Post Rd. E., Marlborough, MA 01752.

   h.  CareWell Urgent Care Needham is located at 922 Highland Ave., Needham, MA 02494.

   i.  CareWell Urgent Care Northborough is located at 333 SW Cutoff, Northborough, MA 01532.

j. CareWell Urgent Care Norwell is located at 42 Washington Park Dr., Norwell, MA 02061.

k. CareWell Urgent Care Peabody is located at 229 Andover St., Peabody, MA 01960.

l. CareWell Urgent Care Somerville is located at 349 Broadway, Somerville, MA 02145.

m. CareWell Urgent Care South Dennis is located at 484 MA-134, South Dennis, MA 02660.

n. CareWell Urgent Care Tewksbury is located at 345 Main St., Tewksbury, MA 01876.

o. CareWell Urgent Care Worcester Greenwood is located at 348 Greenwood St., Worcester, MA 01607.

p. CareWell Urgent Care Worcester Lincoln is located at 500 Lincoln St., Worcester, MA 01605.

### B.2. Defendant CareWell Urgent Care of Rhode Island, P.C.

20.     Defendant CareWell Urgent Care of Rhode Island, P.C. is also headquartered at 2 Adams Pl., Suite 305, Quincy, MA and was founded in August of 2012. The company's registered address in Rhode Island is 535 Centerville Road, Suite 102, Warwick, RI. Olivier Gherardi, M.D. is the company's President and Director.

21.     In 2013, Denise Esselburn was listed as an Authorized Representative of the Corporation: Controller.

22.     In 2014, James Berry was the Company's Treasurer. In 2016, James Jarrett replaced James Berry as Treasurer.

23.     The company operates one (1) urgent care center in Rhode Island.

    a.  CareWell Urgent Care Warwick is located at 535 Centerville Rd., Warwick, RI 02886.

### *B.3. Defendant Urgent Care Centers of New England, Inc.*

24.     Defendant Urgent Care Centers of New England, Inc. is also headquartered at 2 Adams Pl., Suite 305, Quincy, MA and was founded in March of 2012. When founded, Renee Lohman was the company's President and Director. Denise Esselburn was the company's Vice-President and Treasurer. Sally Michael was the company's Secretary.

25.     On or about December of 2013, Shaun Ginter replaced Renee Lohman as the company's President and Director. Today, Lewis Geffen serves as Secretary and James Jarrett is the company's Treasurer and Assistant Secretary.

## V.  <u>CORPORATE STRUCTURE/HIERARCHY</u>

26.     Shaun Ginter currently serves as the CEO of both, Defendant CareWell Urgent Care Centers of Massachusetts and Defendant Urgent Care Centers of New England. He is also a Member on the Board of Directors of Urgent Care Association of America, North East Regional Urgent Care Association, and Urgent Care Assurance Company.

27.     James Berry, Treasurer and Secretary of both CareWell Urgent Care Centers of Massachusetts and Urgent Care Centers of New England, as well as Treasurer of CareWell Urgent Care of Rhode Island, also serves as the President and Director of Multisite, Ltd. This company develops, participates in, and consults healthcare and other operations looking to

optimize the financial leveraging of multi-unit enterprises as well as offering consultative services around Revenue Cycle Management and other Medical Practice operating issues.

28.    James Jarrett is the Chief Financial Officer of CareWell Urgent Care Centers of Massachusetts, as well as Treasurer of CareWell Urgent Care of Rhode Island, and Treasurer and Assistant Secretary of Urgent Care Centers of New England.

## VI.    RELEVANT LAW

### A.  The False Claims Act

29.    The False Claims Act provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]...

(G) knowingly makes, uses, or causes to be made or used, a false record    or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a) (2006), as amended by 31 U.S.C. § 3729(a)(1) (West 2010).[1]

30.    For purposes of the False Claims Act,

(1) the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of

---

[1] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47,099, 47,103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud.

31 .S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b) (West 2010).

## B. The Medicare Program

### *B.1. Basic Medicare Coverage Requirements*

31.     Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A.

32.     The Medicare program is divided into four "parts" that cover different services. Medicare Part B covers medically necessary doctor and other health care providers' services, outpatient care, durable medical equipment, home health care, and some preventive services. Such services are paid under the Physician's Fee Schedule.

33.     Medicare only covers services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Services or supplies are considered medically necessary "if they meet the standards of good medical practice and are: proper and needed for the diagnosis or treatment of the beneficiary's medical condition; furnished for the diagnosis, direct care, and treatment of the beneficiary's medical condition; and not mainly for the convenience of the beneficiary, provider, or supplier." *See* Centers for Medicare & Medicaid Services, Items and Services That Are Not Covered Under the Medicare Program, ICN 906765, January 2015.

34.     Medicare does not cover any excess components that are not medically reasonable and necessary. "Excess component" means an item, feature, or service, and/or the extent of, number of, duration of, or expense for an item, feature, or service, which is in addition to, or is more extensive and/or more expensive than, the item or service which is reasonable and necessary under Medicare's coverage requirements." *See* Medicare Claims Processing Manual, Chapter, § 20.1.3.

35.     In order to make it possible to assess whether services are reasonable and necessary, and therefore eligible for reimbursement, Medicare rules require proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

42 .S.C. § 1395g(a).

### *B.2. Medicare Reimbursements for Urgent Care Services*

36.     Urgent Care Services are defined in 42 CFR 405.400 as services furnished within 12 hours in order to avoid the likely onset of an emergency medical condition. *See* Medicare Benefit Policy Manual, Chapter 15, § 40.29.

37.     Urgent care centers bill Medicare for Evaluation and Management (E/M) services using Current Procedural Terminology (CPT) codes that best represent Patient Type (whether New or Established), Setting of Service (Point of Service code 20) and Level of Service performed. *See* Centers for Medicare & Medicaid Services, Evaluation and Management Services, ICN 006764, August 2016.

38.     For billing Medicare, a provider may use either the 1995 or the 1997 version of the *Documentation Guidelines for Evaluation and Management Services* for a patient encounter, but not a combination of the two. For reporting services furnished on and after September 10, 2013, to Medicare, a provider may use the 1997 documentation guidelines for an extended history of present illness along with other elements from the 1995 documentation guidelines to document an evaluation and management service. *See* Centers for Medicare & Medicaid Services, Evaluation and Management Services, ICN 006764, August 2016.

39.     Any physician or non-physician practitioner (NPP) authorized to bill Medicare services will be paid by the Medicare Administrative Contractor (MAC) at the appropriate physician fee schedule amount based on the rendering UPIN/PIN. *See* Medicare Claims Processing Manual, Pub. No. 100-04, Chapter 12, § 30.6.1. B.

40.     Physician and non-physician practitioners' (NPP) services are paid at non-facility rates for procedures furnished in an urgent care facility. *See* Centers for Medicare & Medicaid Services, MLN Matters Number: MM7631, April 1, 2013.

41.     Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted. The volume of documentation should not be the primary influence upon which a specific level of service is billed. Documentation should support the level of service reported. The service should be documented during, or as soon as practicable after it is provided in order to maintain an accurate medical record. *See* Medicare Claims Processing Manual, Pub. No. 100-04, Chapter 12, § 30.6.1. A.

42.     The descriptors for the levels of E/M services recognize seven components which are used in defining the levels of E/M services. These components are: history; examination; medical decision making; counseling; coordination of care; nature of presenting problem; and time. The first three of these components (i.e., history, examination and medical decision making) are the key components in selecting the level of E/M services. The *1997 Documentation Guidelines For Evaluation And Management Services* describes each component below. The *1995 Documentation Guidelines For Evaluation And Management Services* are also referenced when they differ from the guidelines listed in the 1997 version.

43.     The principles of documentation listed below are applicable to all types of medical and surgical services in all settings. For Evaluation and Management (E/M) services, the nature and amount of physician work and documentation varies by type of service, place of service and the patient's status. The general principles listed below may be modified to account for these variable circumstances in providing E/M services.

- The medical record should be complete and legible.
- The documentation of each patient encounter should include: reason for encounter and relevant history, physical examination findings, and prior diagnostic test results; assessment, clinical impression, or diagnosis; plan for care; and date and legible identity of the observer.
- If not documented, the rationale for ordering diagnostic and other ancillary services should be easily inferred.
- Past and present diagnoses should be accessible to the treating and/or consulting physician.
- Appropriate health risk factors should be identified.
- The patient's progress, response to and changes in treatment, and revision of diagnosis should be documented.
- The CPT and ICD-9-CM codes reported on the health insurance claim form should be supported by the documentation in the medical record.

44. The levels of E/M services are based on four levels of history (Problem Focused, Expanded Problem Focused, Detailed, and Comprehensive). Each type of history includes some or all of the following elements: Chief complaint (CC), History of present illness (HPI), Review of systems (ROS) and Past, family, and/or social history (PFSH).

45. The Chief Complaint is a concise statement describing the symptom, problem, condition, diagnosis, physician recommended return, or other factor that is the reason for the encounter, usually stated in the patient's own words. The medical records should clearly reflect the chief complaint.

46. The History of Present Illness is a chronological description of the development of the patient's present illness from the first sign and/or symptom or from the previous encounter to the present. It includes the following elements: location, quality, severity, duration, timing, context, modifying factors, and associated signs and symptoms. A brief HPI consists of **one to three elements** of the HPI. An extended HPI consists of **at least four elements** of the HPI or the status of at least three chronic or inactive conditions.

47. A Review of Systems is an inventory of body systems obtained through a series of questions seeking to identify signs and/or symptoms that the patient may be experiencing or has experienced. For purposes of ROS, the following systems are recognized: Constitutional Symptoms (e.g. fever, weight loss); Eyes; Ears, Nose, Mouth, and Throat; Cardiovascular; Respiratory; Gastrointestinal; Genitourinary; Musculoskeletal; Integumentary (skin and/or breast); Neurological; Psychiatric; Endocrine; Hematologic/Lymphatic; Allergic/Immunologic. A problem pertinent Review of Systems inquires about the system directly related to the problem(s) identified in the History of Present Illness. An extended Review of Systems inquires

about the system directly related to the problem(s) identified in the History of Present Illness and a limited number of additional systems (**two to nine systems should be documented**). A complete Review of Systems inquires about the system(s) directly related to the problem(s) identified in the History of Present Illness, plus all additional body systems (**at least ten organ systems must be reviewed and individually documented**).

48.     The Past, Family, and/or Social History consists of a review of the patient's past experiences with illnesses, operations, injuries and treatments; a review of medical events in the patient's family, including diseases which maybe hereditary or place the patient at risk; and an age appropriate review of past and current activities. A pertinent Past, Family, and/or Social History is a review of the history area(s) directly related to the problem(s) identified in the History of Present Illness (**at least one specific item from any of the three history areas** must be documented). A complete Past, Family, and/or Social History is a review of two or all three of the Past, Family, and/or Social History areas, depending on the category of the E/M service (**at least one specific item from two of the three history areas** must be documented). A review of all three history areas is required for services that by their nature include a comprehensive assessment or reassessment of the patient. A review of two of the three history areas is sufficient for other services.

49.     The table below depicts the elements required for each type of history. To qualify for a given type of history all three elements in the table must be met. (A chief complaint is required at all levels.)

| History of Present Illness (HPI) | Review of Systems (ROS) | Past, Family, and/or Social History (PFSH) | Type of History |
|---|---|---|---|
| Brief | N/A | N/A | *Problem Focused* |
| Brief Problem | Problem Pertinent | N/A | *Focused Expanded Problem* |
| Extended | Extended | Pertinent | *Detailed* |
| Extended | Complete | Complete | *Comprehensive* |

50.     The levels of E/M services are also based on four types of examination:

      a.   Problem Focused is a limited examination of the affected body area or organ system.

      b.   Expanded Problem Focused is a limited examination of the affected body area or organ system and any other symptomatic or related body areas or organ systems.

      c.   Detailed is an extended examination of the affected body areas or organ systems and any other symptomatic or related body areas or organ system.

      d.   Comprehensive is a general multi-system examination, or complete examination of a single organ system and other symptomatic or related body areas or organ systems.

51.     These types of examinations have been defined for general multi-system and the following single organ systems[2]: Cardiovascular; Ears, Nose, Mouth, and Throat; Eyes; Genitourinary (Female); Genitourinary (Male); Hematologic/Lymphatic/Immunologic; Musculoskeletal; Neurological; Psychiatric; Respiratory; and Skin. The type (general multisystem or single organ system) and content of examination are selected by the examining

---

[2] The 1995 Documentation Guidelines for Evaluation and Management Services recognizes two (2) more organ systems for the purposes of examination: constitutional (e.g. vital signs, general appearances) and gastrointestinal. This makes a total of twelve (12) organ systems.

physician and are **based upon clinical judgment,** the patient's history, and the nature of the presenting problem(s).

52. The following content and documentation requirements should be met for General Multi-System Examinations:

      a.  Problem Focused examination should include performance and documentation of **one to five elements in one or more organ system(s) or body area(s).**

      b.  Expanded Problem Focused examination should include performance and documentation of **at least six elements in one or more organ system(s) or body area(s).**

      c.  Detailed examination should include performance and documentation of **at least two elements in at least six organ systems or body areas.** Alternatively, a detailed examination may include performance and documentation of **at least twelve elements in two or more organ systems** or body areas.

      d.  Comprehensive examination or complete examination should include performance of all elements[3] and documentation of **at least two elements in at least nine organ systems** or body areas.[4]

---

[3] Unless specific directions limit the content of the examination.
[4] The *1995 Documentation Guidelines for Evaluation and Management Services* states that "the medical record for a general multi-system examination should include findings **about 8 or more of the 12 organ systems.**"

*United States ex rel. Aileen Cartier v. CareWell Urgent Care Centers of MA P.C. et al.*
FEDERAL FALSE CLAIMS ACT AMENDED COMPLAINT
**FILED UNDER SEAL**
Page 17 of 80

53.     The following content and documentation requirements should be met for a Single Organ System examination:

   a.   Problem Focused examination should include performance and documentation of **one to five elements.**

   b.   Expanded Problem Focused Examination should include performance and documentation of **at least six elements.**

   c.   Detailed examinations other than the eye and psychiatric examinations should include performance and documentation of **at least twelve elements**. Detailed eye and psychiatric examinations should include the performance and documentation of **at least nine elements**.

   d.   Comprehensive examination should include performance of all elements. Documentation requirements vary by which organ system is examined.

54.     The levels of E/M services recognize four types of medical decision making (straightforward, low complexity, moderate complexity and high complexity). Medical decision making refers to the complexity of establishing a diagnosis and/or selecting a management option as measured by:

   a.   the number of possible diagnoses and/or the number of management options that must be considered (based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis and the management decisions that are made by the physician);

   b.   the amount and/or complexity of medical records, diagnostic tests, and/or other information that must be obtained, reviewed and analyzed; and

c. the risk of significant complications, morbidity and/or mortality, as well as comorbidities, associated with the patient's presenting problem(s), the diagnostic procedure(s) and/or the possible management options.

55. The chart below shows the progression of the elements required for each level of medical decision making. To qualify for a given type of decision making, **two of the three elements** in the table must be either met or exceeded.

| Number of diagnoses or management options | Amount and/or complexity of data to be reviewed | Risk of complications and/or morbidity or mortality | Type of decision making |
|---|---|---|---|
| Minimal | Minimal or None | Minimal | *Straightforward* |
| Limited | Limited | Low | *Low Complexity* |
| Multiple | Moderate | Moderate | *Moderate Complexity* |
| Extensive | Extensive | High | *High Complexity* |

56. The assessment of risk of the presenting problem(s) is based on the risk related to the disease process anticipated between the present encounter and the next one. The assessment of risk of selecting diagnostic procedures and management options is based on the risk during and immediately following any procedures or treatment. The highest level of risk in any one category (presenting problem(s), diagnostic procedure(s), or management options) determines the overall risk.

| Level of Risk | Presenting Problem(s) | Diagnostic Procedure(s) Ordered | Management Options Selected |
|---|---|---|---|
| Minimal | One self-limited or minor problem, eg, cold, insect bite, tinea corporis | Laboratory tests requiring venipuncture<br>Chest x-rays<br>EKG/EEG<br>Urinalysis<br>Ultrasound, eg, echocardiography<br>KOH prep | Rest<br>Gargles<br>Elastic bandages<br>Superficial dressings |
| Low | Two or more self-limited or minor problems<br>One stable chronic illness, eg, well controlled hypertension, non-insulin dependent diabetes, cataract, BPH<br>Acute uncomplicated illness or injury, eg, cystitis, allergic rhinitis, simple sprain | Physiologic tests not under stress, eg, pulmonary function tests<br>Non-cardiovascular imaging studies with contrast, eg, barium enema<br>Superficial needle biopsies<br>Clinical laboratory tests requiring arterial puncture<br>Skin biopsies | Over-the-counter drugs<br>Minor surgery with no identified risk factors<br>Physical therapy<br>Occupational therapy<br>IV fluids without additives |
| Moderate | One or more chronic illnesses with mild exacerbation, progression, or side effects of treatment<br>Two or more stable chronic illnesses<br>Undiagnosed new problem with uncertain prognosis, eg, lump in breast<br>Acute illness with systemic symptoms, eg, pyelonephritis, pneumonitis, colitis<br>Acute complicated injury, eg, head injury with brief loss of consciousness | Physiologic tests under stress, eg, cardiac stress test, fetal contraction stress test<br>Diagnostic endoscopies with no identified risk factors<br>Deep needle or incisional biopsy<br>Cardiovascular imaging studies with contrast and no identified risk factors, eg, arteriogram, cardiac catheterization<br>Obtain fluid from body cavity, eg lumbar puncture, thoracentesis, culdocentesis | Minor surgery with identified risk factors<br>Elective major surgery (open, percutaneous or endoscopic) with no identified risk factors<br>Prescription drug management<br>Therapeutic nuclear medicine<br>IV fluids with additives<br>Closed treatment of fracture or dislocation without manipulation |
| High | One or more chronic illnesses with severe exacerbation, progression, or side effects of treatment<br>Acute or chronic illnesses or injuries that pose a threat to life or bodily function, eg, multiple trauma, acute MI, pulmonary embolus, severe respiratory distress, progressive severe rheumatoid arthritis, psychiatric illness with potential threat to self or others, peritonitis, acute renal failure<br>An abrupt change in neurologic status, eg, seizure, TIA, weakness, sensory loss | Cardiovascular imaging studies with contrast with identified risk factors<br>Cardiac electrophysiological tests<br>Diagnostic Endoscopies with identified risk factors<br>Discography | Elective major surgery (open, percutaneous or endoscopic) with identified risk factors<br>Emergency major surgery (open, percutaneous or endoscopic)<br>Parenteral controlled substances<br>Drug therapy requiring intensive monitoring for toxicity<br>Decision not to resuscitate or to de-escalate care because of poor prognosis |

57.    Urgent Care visits are billed using CPT codes 99201–99215. The table below

from the American Medical Association summarizes the Medicare E/M documentation

regulations pertaining to the components and time requirements for each CPT code. As an

example, Level 4 CPT codes (99204 for New Patients and 99214 for Established Patients)

require at least a detailed documentation of the patient's History, at least a detailed Physical

Examination, and a moderately complex Medical Decision-making. A level 4 visit for new

patients lasts about 45 minutes, whereas a level 4 visit for established patients lasts about 25 minutes.

## CPT Coding Guidelines for Office Visits

*December, 1996*

Documentation in the clinical record must support the level of service as coded and billed.

The Key Components - History, Examination, and Medical Decision Making - must be considered in determining the appropriate code (level of service) to be assigned for a given visit.

### History

| type of patient new | est. | type of history | details of History | | |
|---|---|---|---|---|---|
| | | | HPI | ROS | other history |
| | 99211 | | M.D. presence not required, minimal problem, typically 5 minute service | | |
| 99201 | 99212 | problem focused | brief (1-3 elements) | | |
| 99202 | 99213 | exp. prob. focused | brief (1-3 elements) | prob. pertinent (1 system) | |
| 99203 | 99214 | detailed | ext. (≥4 elements) | extended (2-9 systems) | pertinent (1 area) |
| 99204 | | comprehensive | ext. (≥4 elements) | complete (all systems) | complete (≥ 2 areas) |
| 99205 | 99215 | comprehensive | ext. (≥4 elements) | complete (all systems) | complete (≥ 2 areas) |

### Examination

| type of patient new | est. | type of exam | details of Examination |
|---|---|---|---|
| | 99211 | | exam may not be necessary |
| 99201 | 99212 | problem focused | limited - affected area or organ system |
| 99202 | 99213 | exp. prob. focused | limited - affected area / organ system - other related / symptomatic areas |
| 99203 | 99214 | detailed | extended of affected area / organ system - related / symptomatic areas |
| 99204 | | comprehensive | general multi-system exam or complete exam of single organ system |
| 99205 | 99215 | comprehensive | general multi-system exam or complete exam of single organ system |

### Medical Decision Making

| type of patient new | est. | type of decision making | details of Medical Decision Making | | |
|---|---|---|---|---|---|
| | | | # of diagnoses / management options | amount/complexity of data | risk of complications / morbidity / mortality |
| | 99211 | | may not require medical decision making | | |
| 99201 | 99212 | straightforward | minimal | minimal | minimal |
| 99202 | 99213 | straightforward | minimal | minimal | minimal |
| 99203 | 99214 | low complexity | limited | limited | low |
| 99204 | | moderate complex. | multiple | multiple | moderate |
| 99205 | 99215 | high complexity | extensive | extensive | high |

Note: for new patients, all three key components must meet or exceed the above requirements for a given level of service; for established patients, two of the three key components must meet or exceed the requirements.

| Details of History | | Details of Examination | |
|---|---|---|---|
| **HPI elements (8):** | **ROS systems (14):** | **body areas:** | **organ systems:** |
| location | symptoms (e.g. cough) | head, including face | constitutional |
| quality | eyes | neck | (vital signs, general) |
| severity | ears/nose/throat/mouth | chest, inc. breasts, axillae | eyes |
| duration | cardiovascular | abdomen | ears, nose, throat, mouth |
| timing | respiratory | genitalia, groin, buttocks | cardiovascular |
| context | gastrointestinal | back, including spine | respiratory |
| modifying factors | genitourinary | each extremity | gastrointestinal |
| assoc. signs / symptoms | musculoskeletal | | genitourinary |
| | integumentary | | musculoskeletal |
| **other history areas** | neurologic | | integumentary |
| (e.g. for 99203/14 & up) | psychiatric | | neurologic |
| past history | endocrine | | psychiatric |
| family history | hematologic / lymphatic | | hematologic / lymphatic |
| social history | allergic / immunologic | | / immunologic |

* four additional factors may be considered in determining the appropriate code (level of service) for a visit:
  1. nature of the presenting problem (minimal, self-limited/minor, low, moderate, or high severity)
  2. coordination of care with other health care professionals *
  3. counseling
  4. time - see chart below for "typical" time spent (face-to-face with patient/family for the various levels of service

| | 5 min | 10 min. | 15 min. | 20 min. | 25 min. | 30 min. | 40 min. | 45 min. | 60 min. |
|---|---|---|---|---|---|---|---|---|---|
| new patient | | 99201 | | 99202 | | 99203 | | 99204 | 99205 |
| est. patient | 99211 | 99212 | 99213 | | 99214 | | 99215 | | |

* when counselling or coordination of care comprises more than 50% of the visit or service rendered, time is the key factor in determining the appropriate code and the total time spent should be clearly documented.

for more detail, please consult the AMA's annual Physician's Current Procedural Terminology, available from the AMA and other publishers

**American Medical Association**

58.    Medicare reimbursement varies by CPT code and locality of service. Higher level codes represent more complex visits and yield higher reimbursement levels. In order to bill the highest levels of visit codes, the services furnished must meet the definition of the code. *See* Medicare Claims Processing Manual, Pub. No. 100-04, Chapter 12, § 30.6.1. D. The table below shows the nationwide reimbursement for different urgent care services as well as reimbursement for different urgent care services in different regions within the Commonwealth of Massachusetts.[5]

| LEVEL | PATIENT TYPE | MODIFIER | NATION-WIDE (0000000) | METROPOLITAN BOSTON (1421201) | REST OF MASSACHUSETTS (1421299) |
|---|---|---|---|---|---|
| 1 New | 99201 | $ 44.04 | $ 47.73 | $ 45.30 |
| 1 Established | 99211 | $ 20.05 | $ 22.18 | $ 20.90 |
| 2 New | 99202 | $ 75.19 | $ 81.02 | $ 77.23 |
| 2 Established | 99212 | $ 43.68 | $ 47.51 | $ 45.08 |
| 3 New | 99203 | $ 108.85 | $ 116.23 | $ 111.13 |
| 3 Established | 99213 | $ 73.40 | $ 78.92 | $ 75.42 |
| 4 New | 99204 | $ 166.13 | $ 176.21 | $ 169.30 |
| 4 Established | 99214 | $ 108.13 | $ 115.96 | $ 111.03 |

### B.3. Modifier -25

59.    There are circumstances when it is appropriate to report an E/M service code in addition to the procedures provided on the same date, provided the key components (i.e. history, examination and medical decision making) are met. In such cases, a Modifier -25 can be added to the CPT code. Medicare requires that Current Procedural Terminology (CPT) modifier -25 "shall be appended to the medically necessary E/M service identifying this service as a

---

[5] Data retrieved from https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx

significant, separately identifiable service... and only when these services are provided by the same physician (or same qualified non-physician practitioner) to the same patient on the same day as another procedure or other service... above and beyond the usual pre- and post-operative work of the procedure. Different diagnoses are not required for reporting the E/M service on the same date as the procedure or other service." *See* Medicare Claims Processing Manual, Publication 100-04, Chapter 12, Section 30.6.

### C. The Medicaid Program

60.    Established in 1965, Medicaid is the largest publicly financed program providing health and long-term care coverage for certain groups of low-income people throughout the United States. Authorized under Title XIX of the Social Security Act, Medicaid is a means-tested individual and state entitlement program jointly financed by states and the federal government. Medicaid eligibility is limited to individuals who fall into five broad coverage categories: children; pregnant women; adults in families with dependent children; individuals with disabilities; and the elderly. In addition to categorical eligibility, persons must also meet income and asset requirements, as well as immigration and residency requirements.[6]

61.    The federal government shares the States' cost of providing coverage for certain basic or mandatory services to most categorically needy Medicaid beneficiaries. The federal government pays states for a specified percentage of program expenditures, called the Federal Medical Assistance Percentage (FMAP). The FMAP varies by state based on criteria such as per capita income. The regular average state FMAP is 57%, but ranges from 50% in wealthier states up to 75% in states with lower per capita incomes (the maximum regular FMAP is 82

---

[6] Retrieved from https://www.medicaid.gov/medicaid/eligibility/index.html

%). FMAPs are adjusted for each state on a three-year cycle to account for fluctuations in the economy. Thus, claims submitted to state Medicaid programs cause claims to be made to both the United States and the state.[7]

### C.1. Massachusetts Regulations

62.     In Massachusetts, Medicaid and the Children's Health Insurance Program (CHIP) are combined into one program called MassHealth. MassHealth offers health care services, including doctor visits, prescription drugs and hospital stays, to low-and medium-income people living in Massachusetts.[8]

63.     The MassHealth agency will not pay a provider for services that are not medically necessary and may impose sanctions on a provider for providing or prescribing a service or for admitting a member to an inpatient facility where such service or admission is not medically necessary.

    (A) A service is "medically necessary" if:

    - it is reasonably calculated to prevent, diagnose, prevent the worsening of, alleviate, correct, or cure conditions in the member that endanger life, cause suffering or pain, cause physical deformity or malfunction, threaten to cause or to aggravate a handicap, or result in illness or infirmity; and

    - there is no other medical service or site of service, comparable in effect, available, and suitable for the member requesting the service, that is more conservative or less costly to the MassHealth agency. Services that are less

---

[7] Retrieved from https://www.medicaid.gov/medicaid/financing-and-reimbursement/
[8] Retrieved from http://www.mass.gov/eohhs/gov/departments/masshealth/

*United States ex rel. Aileen Cartier v. CareWell Urgent Care Centers of MA P.C. et al.*
FEDERAL FALSE CLAIMS ACT AMENDED COMPLAINT
**FILED UNDER SEAL**
Page **24** of **80**

costly to the MassHealth agency include, but are not limited to, health care reasonably known by the provider, or identified by the MassHealth agency pursuant to a prior-authorization request, to be available to the member through sources described in 130 CMR 450.317(C), 503.007, or 517.007.

(B) Medically necessary services must be of a quality that meets professionally recognized standards of health care, and must be substantiated by records including evidence of such medical necessity and quality. A provider must make those records, including medical records, available to the MassHealth agency upon request. (See 42 U.S.C. 1396a(a)(30) and 42 CFR 440.230 and 440.260.)

(C) A provider's opinion or clinical determination that a service is not medically necessary does not constitute an action by the MassHealth agency.

(D) Additional requirements about the medical necessity of acute inpatient hospital admissions are contained in 130 CMR 415.414.

(E) Any regulatory or contractual exclusion from payment of experimental or unproven services refers to any service for which there is insufficient authoritative evidence that such service is reasonably calculated to have the effect described in 130 CMR 450.204(A)(1).

See 130 CMR 450.204.

### C.2. Rhode Island Regulations

64.    Rhode Island Medicaid offers health coverage through two participating Medicaid health plans: RIte Care and RIte Share. The focus of RIte Care is to ensure that families on the Family Independence Program (FIP) - formerly the AFDC program - and eligible uninsured

pregnant women, children, and families have access to comprehensive health care services. RIte Care utilizes United Healthcare Community Plan of New England or Neighborhood Health Plan of RI to provide coverage. RIte Share is a premium assistance program that pays all or a portion of an eligible employee's share of employer-sponsored health insurance premiums.[9]

65.     The Rhode Island Medicaid Program provides payment for covered services only when the services are determined to be medically necessary. The term "medical necessity" or "medically necessary service" means medical, surgical, or other services required for the prevention, diagnosis, cure or treatment of a health related condition including such services necessary to prevent a decremental change in either medical or mental health status. Medically necessary services must be provided in the most cost effective and appropriate setting and shall not be provided solely for the convenience of the beneficiary, caretaker, or service provider. *See* RI Medicaid Provider Reference Manual, General Guidelines, Version 1.2, January, 2016.

## VII.     CAREWELL'S RELATIONSHIP WITH URGENT CARE CENTERS

66.     CareWell owns the seventeen (17) urgent care centers for which it provides evaluation and management services to its patients and, on information and belief, certain CareWell medical providers bill Medicare and Medicaid for the services.

## VIII.     COMPANY-WIDE PRACTICES AND FACTS RELATING TO FALSE AND FRAUDULENT SCHEMES (COUNTS I AND II BELOW)

67.     The Relator observed that at each CareWell urgent care center, CareWell employs an on-site manager known as the Practice Manager. That individual oversees the day to day operations at the facility (including scheduling, staff training, and review of billing charts) and

---

[9] Retrieved from
http://www.eohhs.ri.gov/Consumer/FamilieswithChildren/HealthcarePrograms.aspx
*United States ex rel. Aileen Cartier v. CareWell Urgent Care Centers of MA P.C. et al.*
FEDERAL FALSE CLAIMS ACT AMENDED COMPLAINT
**FILED UNDER SEAL**
Page **26** of **80**

reports to the Market Leader in the respective territory. The Market Leader oversees the operations in several facilities within a territory in Massachusetts, ensures that budget and financial expectations are met, and reports to higher management at CareWell, including Shaun Ginter (CEO) and John Cornwell, MD (President and Regional Medical Director for Massachusetts).

68.     During her period of employment with the Defendants, Relator Cartier made observations and was told specific information which confirmed that the fraudulent practices and procedures referenced herein, including those violating Medicare and Medicaid regulations, originated and emanated from CareWell's management at the company headquarters in Quincy, MA. The wrongdoing as described herein is not limited to particular CareWell centers, but rather the fraud is a set of systematic and companywide schemes implemented throughout CareWell facilities to maximize Medicare and Medicaid reimbursements. The company practices and mandates as described herein are in fact implemented rigidly from management down to the practice managers, physicians, nurse practitioners and billers.

### A. Use of Athena, a Company-wide Real-time Software Program

69.     The Relator states that all CareWell facilities use the Athena software for patient documentation and that the data is inputted into the software at each facility and received real time at the company headquarters. This means that the management of CareWell monitors every aspect of the operations occurring at all the CareWell urgent care facilities real-time via the computer system and knows daily whether or not the company's mandates are being met. The Relator has worked at six (6) separate CareWell facilities and has used this software to record and document the evaluation and treatment of her patients. The six (6) facilities are Cambridge

Inman, Cambridge Fresh Pond, Somerville, Northborough, Worcester Lincoln and Worcester Greenwood. The Relator observed that providers working at multiple facilities select the facility they want to access after logging into Athena and can then access patient records from any CareWell facility. This indicated to the Relator that patient information from the different facilities is recorded into the same software system and can be accessed from any CareWell urgent care facility.

70.     In September of 2016, during a telephone conversation with Dr. John Cornwell, the Relator learned that the computer system operates in real-time. Dr. Cornwell had called the Relator to discuss her billing practices. He said that he was going through the Relator's charts in real-time and that she was not billing correctly. The Relator said that she was billing based on the medical complexity of the patients' actual conditions as observed. However, Dr. Cornwell insisted that the patients should have been billed a level higher than the Relator had coded them.

71.     The significance of the use of the real-time software program is that it shows that the fraudulent schemes orchestrated by the company management are implemented by management through this system. This also confirms the company's management knowledge of the wrongdoing.

## IX.     COMPANY WRONGDOING

72.     CareWell employs physicians, nurse practitioners, physician assistants, nurses, medical assistants, radiology technicians, and other medical providers to oversee patient care, evaluate patient medical conditions, and attend to patient needs in accordance with medical standards in their particular field. The Relator observed that when a patient is sent to a CareWell facility, he/she undergoes an admission process which requires an exchange of information. This

includes filling out the "Intake" forms in an iPad. Then, the patient is directed into an examination room where the nurse or medical assistant obtains the patient's vital signs data (pulse, blood pressure, etc.), and documents the history component of the visit (including a review of systems). The nurse or medical assistant also performs any necessary baseline testing, such as urine dipstick or strep tests. The nurse or medical assistant then leaves the examination room and notifies the physician, nurse practitioner or physician's assistant that the patient is ready to be seen. The nurse or medial assistant also provides the physician, nurse practitioner, or physician's assistant with a verbal summary of the patient's condition. The physician, nurse practitioner, or physician's assistant first reviews the information the nurse or medical assistant documented in the Athena software and then enters the examination room to attend to the patient. The physician or nurse practitioner examines and treats the patient for the reason the patient came into the facility and orders any additional, more complicated[10] tests that may be needed, such as STD testing or adenovirus tests. The physician or nurse practitioner then leaves the exam room to print and fill out the discharge forms. In general, the patient waits between five (5) to thirty (30) minutes for the test results to generate and for the physician or nurse practitioner to interpret them. If no test results are pending, the physician or nurse practitioner returns to the examination room a few minutes later, the patient signs the discharge documents, and the visit is completed. Once the patient has left the examination room, the physician or nurse practitioner edits/completes documentation in the Athena software and enters the CPT code to be billed for

---

[10] The Relator states that the following are among the tests and medications not administered at the CareWell facilities. **These tests and medications have to be ordered from elsewhere: blood tests and STD tests.**

the visit. The wrongdoing, as explained below, begins the moment the patient enters the exam room.

A. CareWell Practices that Caused False Claims for Unreasonable or Unnecessary Evaluation and Management Services Unrelated to the Patients' Medical Needs

73.     The type of review of systems and physical examination performed on each patient is, by regulation, a matter of clinical judgment for each medical provider, be it doctor, nurse practitioner, or nurse. Indeed, to meet the requirements of Medicare and Medicaid, each patient must be individually evaluated by a trained medical provider in order to properly assess the patient's individual care needs.[11] **However, CareWell usurps the role of the medical providers by mandating that each patient receive a "limited complete" review of systems and physical exam, regardless of whether there is a need for it. By requiring these reviews and physical examinations, CareWell automatically bumps up the service levels billed under the CPT codes, thereby fraudulently increasing Medicare and Medicaid reimbursements.**

74.     At each CareWell urgent care facility, as mentioned, once the patients are in the exam room, the nurses or the medical assistants take the patients' vital signs and document the history component of the visit in the Athena software. In doing this, the nurses and medical assistants document the patients' chief complaint (CC), history of present illness (HPI), review of systems (ROS) and past, family, and/or social history (PFSH). After documenting the chief

---

[11] Medicare only covers services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." See paragraph 33 herein. This means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs.

complaint and a brief chronological description of the development of the patients' present illness, the nurses or medical assistants ask a series of questions to identify the signs and/or symptoms that the patients may be experiencing or have experienced. The Defendants mandate that a "limited complete[12]" review of systems be documented for all patients. The CareWell requirement is that the nurses and medical assistants must document as having asked at least one (1) question for *thirteen (13) separate body systems* during all patient visits, even when such reviews are not medically necessary because the patients' chief complaint does not warrant it.

75.     After the nurses or medical assistants have documented the history component and performed the necessary baseline tests, the patients are examined by a physician, nurse practitioner or physician's assistant. Per Medicare regulations, "the type (general multisystem or single organ system) and content of examination are selected by the examining physician and are based upon clinical judgment, the patient's history, and the nature of the presenting problem(s)." *See* paragraph 51 herein. Contrary to Medicare regulations, the Defendants mandate that the physicians, nurse practitioners, and physician's assistants examining the patients perform a "limited complete" physical examination on all patients, rather than relying on the patients' individual clinical needs. This means that the physicians and nurse practitioners must examine every body system[13] and document at least one element from each system during all patient visits, without relation to the nature of the patients' presenting problems, history, or condition as observed during the visit. By requiring that all patients have *at least thirteen (13)* body systems

---

[12] Medicare defines a "complete" review of systems as the review and individual documentation of at least ten body systems.

[13] With the exception of the genitourinary system (breast and rectal), which are examined only if the patient's chief complaint is relating to these areas.

examined[14], the Defendants supersede the examining physicians' or nurse practitioners' clinical judgement of what is medically necessary.

76.     The Relator observed that Dr. Cornwell visited the Cambridge Fresh Pond facility sometime in late June/early July of 2016, shortly after she began working for CareWell, to tell the Relator about the company's requirements and "apply pressure" to the other employees to follow the company's mandates. Dr. Cornwell told the Relator to "examine at least one item from all body systems." He suggested that the Relator "choose things that are easy to see under every category." In other words, the physicians and nurse practitioners are to document at least one element from each body system that can be easily observed simply by looking at the patients. The Relator also saw Dr. Cornwell speak to Christina Sok, Registered Nurse working at Cambridge Inman and Cambridge Fresh Pond, emphasizing the need to document a "limited complete" review of systems for all patients.

77.     As an example, if a 10-year-old patient's chief complaint is finger pain due a sports related injury, the patient's management would not require that the nurse or the medical assistant inquire about whether or not the patient has experienced sleep disturbances (psychiatric), has chest pain (cardiovascular), or is experiencing fatigue (endocrine). In this example, the patient's management also does not require that the physician, nurse practitioner, or physician's assistant examine the patient's head, eyes, ear/nose/mouth/throat, neck, lungs, or abdomen. Such inquiries and examinations are not medically necessary for the diagnosis or treatment of the illness/injury at issue and there is no reason for them to be performed.

---

[14] Per CareWell's mandates, the body systems that must be reviewed during all patient visits include: Constitutional; Psychiatric; Head; Eyes; Ears, Nose, Mouth, Throat; Neck; Lungs; Cardiovascular; Abdomen; Musculoskeletal; Neurologic; Skin; and Back.

Nonetheless, this is what happens with each CareWell patient by specific corporate mandates. Documentation of these inquiries and examinations invariably correlates with higher evaluation and management service levels. CareWell mandates that the nurses or medical assistants inquire about, and that the physicians, nurse practitioners or physician's assistants examine, more body systems than is medically necessary in order to bump up the level of service billed for the visit. This is directly contrary to Medicare regulations which state that "medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted." *See* paragraph 41 herein. No clinical reasoning or support is used in determining the level of history and physical examination performed and documented for the patients.

78.     An email sent to the providers at the different facilities on 09/08/2016 by John Cornwell, MD (President of CareWell, Regional Medical Director) stated: "When we move to streamlined [sic] the intake process includes the ROS (review of systems) and the CareWell template will be loaded into the chart. As a provider you may edit or change it as indicated…The limited complete review of systems will be standard of care for carewell [sic] on every patient every time. Staff are being trained to do this to facilitate patient care." Based on information, the Relator states that no additional training has been done.

79.     On or about 10/11/2016, the Relator decided to perform and document the review of systems on the patients she treated, instead of having the nurses/medical assistants continue to do so. The reason she did this was because she noticed that the answers to the review of system questions documented by the nurses and medical assistants in the Athena software were

inconsistent with the answers the patients gave to the Relator during her evaluation and treatment of the patients. This caused her to conclude that the nurses and medical assistants simply selected thirteen (13) answers from a template, one for each body system, without actually asking the questions about the thirteen (13) body systems during the patient visits. The Relator does not know whether or not the nurses and medical assistants actually asked the questions before selecting an answer when documenting the patients' review of systems. On information and belief, it appears they did not do so.

80. The Relator recalls a conversation she had with Christina Sok, a Registered Nurse working at the CareWell Cambridge Inman and Cambridge Fresh Pond facilities, on 12/13/2016. Ms. Sok was expressing frustration about Dr. Shehzaad Zaman, a physician at the Cambridge Inman facility. Ms. Sok told the Relator that she had asked Dr. Zaman if he actually asks all of the questions during the review of systems. Dr. Zaman had said "not exactly." Ms. Sok proceeded to ask if, for example, he asked a patient with symptoms related to a urinary tract infection whether he/she has had a cough. Dr. Zaman said "no," but that he documented all the systems nonetheless because Dr. Cornwell had asked him to.

81. The Relator also recalls a conversation she had with Shannon[15], a Registered Nurse working at the CareWell Worcester Greenwood facility, occurring on 10/29/2016. Shannon told the Relator that she was instructed by the head nurse at the facility to "select one thing from every category, she never told me that I had to actually ask the questions." In September of 2016, the Relator had also been told the same thing by Abby Luberice, a former nurse at the Cambridge Inman facility. Ms. Luberice told the Relator she was instructed to "just

---

[15] The Relator does not know Shannon's last name at this time.

make sure that I check a box from every category."

82.     When the Relator performed a review of systems and physical examinations she used written coding guidelines she received from another employer in determining the level of service to be billed for each visit. These guidelines are reflective of the *1995 Documentation Guidelines for Evaluation and Management Services*. She had not been provided with any coding guidelines from CareWell and does not believe any other employees were provided with coding guidelines. Based upon the patients' presenting problems, the Relator determined that a "complete," 13-point review of systems was not medically necessary, so she would perform a limited, problem focused review of systems on those patients with minor problems, stable vital signs, and no comorbidities. At the same time, the Relator would examine only the body systems related to the patients' presenting problems. However, CareWell management demanded that the Relator meet the company's mandates for a "limited complete" review of systems and physical examination, even when the application of these mandates was medically unnecessary for the diagnosis or treatment of the patients' illnesses or injuries. These demands are what ultimately lead the Relator to meet with the Massachusetts' Attorney General's office on 10/19/2016 to express concerns regarding the Defendants' practices, which she believes are fraudulent.

83.     Between 10/21/2016 and 10/31/2016, Relator Cartier purposely refused to follow CareWell's mandates and performed only a review of systems and physical examination that she felt were medically necessary. This resulted in lower coding for the patient visits and was noticed by upper management at CareWell, setting off a flurry of emails to her with instructions on how to evaluate and bill according to the Defendants' policies.

84.     On 10/26/2016, Courtney Kelliehan, Practice Manager at both Cambridge Inman

and Cambridge Fresh Pond, sent Relator Cartier and Christina Sok an email. Ryan Sadlier (Market Leader-Central Territory) was copied on the email. Mr. Kelliehan stated: "The following charts have an insufficient ROS. Please review the email attached below for Carewell [sic] charting guidelines." Mr. Kelliehan then listed four patients with insufficient review of systems. Three (3) to six (6) systems were documented for the patients listed, but this did not meet the Defendants' requirements. Relator Cartier responded on 10/27/2016 explaining that the number of systems reviewed and documented for each of the four patients was based upon the patients' chief complaints/history of present illnesses.

85.    Ryan Sadlier (Market Leader-Central Territory) replied to Relator Cartier's email on 10/27/2016, saying: "As far as the ROS goes…this was a follow up email I just received from Dave Shafner[16] [sic]…'I just checked and the CareWell default ROS is still 13 points. There should be no change there. Per Dr. Cornwell, this is NOT optional. Every urgent care visit, every patient, gets this done. This must be done per our risk management, and for our malpractice insurance. I don't know how to word it more strongly. If you aren't sure how to add the default ROS for people give me a call in Peabody and I can walk you through it.'"

86.    Relator Cartier replied to Mr. Sadlier on 10/27/2016 explaining to him: "I wrote back with concrete examples to show patients with low acuity (no sig medical history, stable vital signs, and a complaint that only involves 1 body system) oftentime [sic] only need a focused history and physical for that complaint…Doing the complete history and physical exam on patients like these feels like it is done to elevate the level of the visit, and is, by current

---

[16] David Schaffner is a Nurse Practitioner at CareWell. The Relator states that he is the trainer on the Athena software and works closely with Dr. Cornwell.

standards overkill. I respect that CareWell has policies, but at the end of the say, my job is about patient care. Oftentimes when I do a full history and physical on patients (like the examples above) they often appear to be confused and ask me why I'm examining things that have nothing to do with their injury or ailment."

87.    Dr. John Cornwell replied to the Relator's email on 10/31/2016 stating: "I was referred the message below and must with due respect let you know that you are not following policy. please [sic] let our staff do the intake 15 question[17] 'YES/NO' review of system...your focused review is not the policy of carewell [sic] and is not supported by your malpractice carrier...our policy is that every patient has a limited complete history, ROS and Physical exam...when you were hired we discussed this at your training session and you agreed at that time that his [sic] was a policy that you could work with. If this is not going to work with you, please let me know. I would like to remind you that you are practicing at carewell [sic] under my supervision and this is not up for discussion."

88.    On 10/27/2016, Shaun Ginter, CEO of CareWell Urgent Care Centers of Massachusetts and Urgent Care Centers of New England, sent an email to Dr. Cornwell, Olivier Gherardi (President of CareWell Urgent Care of Rhode Island), and the Market Leaders. The subject line of the email states: "See below comments from last nights [sic] coding review" and the body of the email includes a chart with the patients' names, dates of service, CareWell facility of service, comments and status. The four patients referenced in Courtney Kelliehan's 10/26/2016 email to Relator Cartier are listed among the patients in Mr. Ginter's chart. Prior to

---

[17] Relator Cartier states that there are a total of thirteen (13) body systems. She adds that Dr. Cornwell might be referring to the ears, nose, mouth and throat as separate systems, but these are categorized under one system ("ENMT") per Medicare regulations.

emailing Relator Cartier on 10/31/2016, Dr. Cornwell responded to the email from Mr. Ginter saying: "I reviewed the charts from Cambridge and they are definitely incomplete, the intake was incomplete; done by Christina Sok.. I am sure that the other charts will reveal the same thing…in every case it is apparent in the chart that the staff is not answering every question in the HPI (history of present illness) or doing the 15 question "YES/NO" review of systems. I think the practice managers can easily discuss this with the staff to get it right." Ms. Sok forwarded this email to Relator Cartier on November 20, 2016.

### B. Presumptively upcoding the level of service of a **substantial number of** patients either from a level 2 to a level 3, from a level 3 to a level 4, or from a level 2 to a level 4 rather than relying on individualized patient medical history, examination and medical decision making to determine the level of care most suited to each patient's clinical needs

89.     The Defendants upcode the level of service either from a level 2[18] to a level 3[19], or from a level 3 to a level 4[20], or from a level 2 to a level 4, rather than relying on individualized patient histories, examinations and complexity of the medical decision making in determining the level of care most suited to each patient. This is directly contrary to Medicare regulations which state that Medicare covers only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *See* paragraph 33 herein. This is also directly contrary to Massachusetts Medicaid regulations, which state that MassHealth only covers services that are "reasonably calculated to prevent, diagnose, prevent the worsening of, alleviate, correct, or cure conditions" and only when "there is no other comparable, available, and suitable medical service or site of service that is more conservative or less costly to the MassHealth

---

[18] CPT code 99202 for new patients and CPT code 99212 for established patients.
[19] CPT code 99203 for new patients and CPT code 99213 for established patients.
[20] CPT code 99204 for new patients and CPT code 99214 for established patients.
*United States ex rel. Aileen Cartier v. CareWell Urgent Care Centers of MA P.C. et al.*
FEDERAL FALSE CLAIMS ACT AMENDED COMPLAINT
FILED UNDER SEAL

agency." *See* paragraph 63 herein. In addition, this is also directly contrary to Rhode Island Medicaid regulations which state that the RI Medicaid program only provides payment for covered services only when the services are determined to be medically necessary, meaning "medical, surgical, or other services required for the prevention, diagnosis, cure or treatment of a health related condition...not be provided solely for the convenience of the beneficiary, caretaker, or service provider." *See* paragraph 65 herein.

90. Three components—history, examination and medical decision-making— primarily determine the CPT code to be billed for an urgent care visit.[21] Within each component, specific Medicare requirements must also be met. For a level 4 visit for established patients, documentation of the history component must show four (4) elements from the history of present illnesses[22]; two (2) to nine (9) body systems reviewed[23]; and one element from past/family/social history[24]. Documentation for the physical examination must show that at least two (2) elements in at least six (6) body systems[25] were examined. In addition, the medical decision making for a level 4 visit for established patients must be moderately complex. For a level 4 visit for new patients, documentation of the history component must show four (4) elements from the history

---

[21] The 1995 and 1997 *Documentation Guidelines for Evaluation and Management Services* state that the descriptors for the levels of E/M services recognize seven components which are used in defining the levels of E/M services. These components are: history; examination; medical decision making; counseling; coordination of care; nature of presenting problem; and time. The three key components when selecting the appropriate level of E/M services provided are history, examination, and medical decision making. The last four of these components are subsidiary in determining the level of service. *See* paragraph 42 herein.

[22] This is an "extended" history of present illnesses, per Medicare regulations.

[23] This is an "extended" review of systems, per Medicare regulations.

[24] This is a "pertinent" past/family/social history, per Medicare regulations.

[25] This is a "detailed" examination, per Medicare regulations. Alternatively, twelve (12) elements in two (2) or more body can be examined.

of present illnesses; at least ten (10) body systems reviewed[26]; and past, family, and social history must also all[27] be documented. Documentation for the physical examination must show that at least two (2) elements in at least nine (9)[28] body systems[29] were examined. In addition, the medical decision making for a level 4 visit for new patients must be moderately complex. Extensive documentation of the history and the physical examination, coupled with more complex medical decision-making, yield to higher levels of Medicare and Medicaid reimbursement.

91. At each CareWell facility, the physician or nurse practitioner who treated the patient enters the CPT code to be billed for the visit into the company-wide Athena software after the patient has left the examination room. The code selected for the service is based upon the content of the service, as described in paragraph 90 above. When the level billed for the visit was based on a medically necessary documentation of history and physical exam, rather than in accordance with the Defendants' mandates that all patients must receive a "limited complete" review of systems and physical exam, the patient visits were **most all** upcoded by the Practice Managers, Market Leader or the third-party billers.

92. At the end of the day, the facilities' practice managers review the billing charts for billing errors and insurance errors, and ensure that all chart elements essential for claim billing are complete and properly executed by the clinical staff. The "Audit History" section under the Billing tab in the patients' profiles lists the names of the persons who have entered a

---

[26] This is a "complete" review of systems, per Medicare regulations.
[27] This is a "complete" past/family/social history, per Medicare regulations.
[28] This is based on the 1997 Documentation Guidelines for Evaluation and Management Services. The 1995 guidelines state that eight (8) body systems must be examined.
[29] This is a "comprehensive" exam, per Medicare regulations.

service code for the visit. The Audit History reveals that the practice managers, who have had no contact with the patients, add a higher level E/M code during their daily review of the patient charts. This results in an upcoding of the visits either from a level 2 to a level 3, from a level 3 to a level 4, or from a level 2 to a level 4. This upcoding is engaged without consulting the patients' treating physicians or nurse practitioners. In other instances, the Audit History section of the Billing tab shows that Ryan Sadlier (Market Leader-Central Territory) upcodes the visits. After review by the practice managers and the market leaders, the claims are sent to a third-party billing company.[30] Those patient visits which were not upcoded by the practice managers or the market leaders are **most all** upcoded by the third-party billers, days after the visit took place.

93.      The Relator observed that the practice managers who upcode the visits do not necessarily have a medical background. As an example, Courtney Kellichan, Practice Manager at both Cambridge Inman and Cambridge Fresh Pond, had no medical background and previously worked as a Field Colleague Trainer and Assistant Manager for CVS Health and as a Customer Service Manager Store Trainer for Bed Bath and Beyond Inc.

94.      Relator Cartier spoke with Mr. Kellichan on or around 10/17/2016, while working at the Cambridge Inman facility, regarding the issue of upcoding. Mr. Kellichan told the Relator that he was instructed by Shaun Ginter to review the billing charts at the end of the day and to always upcode to a level 4 every patient visit not already coded as a level 4. In addition, Mr. Kellichan told the Relator that he was instructed to automatically upcode to a level 4 all visits

---

[30] Based on information and belief the name of the third-party billing company is "Sapphire Medical Billing." The company is headquartered in Nanuet, New York but the Relator learned from Kristin Mannke (Nurse Practitioner at the Tewksbury and Lexington facilities) that the company outsources to India. The Relator states that Courtney Kellichan (Practice Manager) confirmed that Sapphire is located in India.

during which the patients had lab work or x-rays done. The Relator expressed her concerns about the company practices and Mr. Kelliehan agreed, adding that he believed "the things this company is doing might be fraudulent."

95.     According to the Physicians Fee Schedule, on average, nationwide Medicare reimbursement for a level 3 visit is between $29.72 (established patient) and $33.66 (new patient) more than Medicare reimbursement for a level 2 visit. Similarly, on average, nationwide Medicare reimbursement for a level 4 visit is between $34.73 (established patient) and $57.28 (new patient) more than Medicare reimbursement for a level 3 visit. The Relator states that the majority of the patients who visit the CareWell facilities are new patients. In addition, the Relator states that sixteen (16) CareWell facilities[31] treat an average of 444 patients daily.

96.     Relator Cartier recalls a phone call from Dr. Cornwell on 09/22/2016 regarding her billing practices. He told the Relator that he was going through her patient charts in real time and that she was consistently billing at an incorrect rate. He said: "They should be level 4 visits and you are coding at level 3. If you do not bill at a level 4, it would be a deal breaker. It doesn't even cost the patient more money. This is the second time I am speaking to you about this and I need you to change your behavior." The Relator asked if she could speak to a coder in order to better understand the issue. In response, Dr. Cornwell said: "No you may not speak to a coder. It's just in the guideline."

97.     The guideline Dr. Cornwell was referring to is the "Level 4 Reference Card." Dr. Cornwell directed the Relator to look at the guidelines in the clinical manual[32] during the call.

---

[31] The calculation excludes data on the Fitchburg facility.
[32] The Relator says that the clinical manual is located on a table next to the computers in the clinical area.

However, the Relator had looked through the manual before and had not found any coding guidelines. Nor had she been told that any coding guidelines existed prior to this phone conversation, despite having been a full-time employee of the company for several months. She reported this to Dr. Cornwell during the phone call. A few minutes later, the Relator saw that Courtney Kellichan, Practice Manager, received a call from Dr. Cornwell. Following the call, Mr. Kellichan left the clinical area. When he returned, he was holding a document, which he placed inside the clinical manual. Shortly thereafter, the Relator checked the clinical manual again and found the Level 4 Reference Card inside. This is the only coding guideline the Relator saw in the clinical manual and the only coding guideline she has been given to date.

98.     Dr. Cornwell sent a follow-up email to the Relator on 09/27/2016 saying: "i [sic] hope you had a chance to review the coding guidelines i [sic] would suggest that an x-ray study Pt ▓▓▓▓▓▓▓ has HPI (history of present illness), ROS (review of systems) PE (physical examination) and should be moderate complexity in that you read an x-ray, so could be level 4…patients that have more than one Rx (prescription) should also probably be level 4…your HPI, ROS and PE templates will enable you to use the level based on risk and decision making and when you prescribe more than one medication or you read and [sic] x-ray it is moderately complex decision making. you [sic] are currently coding average at level 3.34, Carewell average is 3.7, urgent care industry standard is 3.7."

99.     Edward Levitan, M.D. is a physician who primarily works at the CareWell Cambridge Fresh Pond facility. The Relator has learned that Dr. Levitan gave his notice that he is leaving his employment with CareWell at the end of December 2016. She overheard the

nurses[33] at the Cambridge Inman facility on or about 12/04/2016 say that Dr. Cornwell repeatedly went to Fresh Pond to talk to Dr. Levitan because he "wasn't billing appropriately." Dr. Levitan apparently refused to change his practices. According to the nurses, Dr. Cornwell suggested that, if he wished to continue his employment with CareWell, Dr. Levitan would have to relocate to the CareWell Northborough facility. The Relator, on information, believes that Dr. Levitan resides near Wellesley, MA and the drive to Northborough, MA is about forty (40) minutes long.

100. During a conversation with Courtney Kelliehan on 10/17/2016 (see paragraph 94 herein), Mr. Kelliehan told the Relator that Kim Brown, Practice Manger at the Billerica facility, also did not agree with the company's billing policies and procedures. On or about 12/02/2016, during a conversation about facility staffing, Mr. Kelliehan said that Ms. Brown had recently quit her job.

### Patient Examples

101. By way of illustration of the information noted above, the following are examples of patients who received a medically unnecessary review of systems and physical examination, and were upcoded pursuant to Defendants' fraudulent practices and procedures.

**Patient One**

102. Relator Cartier has specific and independent knowledge that Patient 1 received a medically unnecessary review of systems and physical examination, which resulted in the visit being fraudulently upcoded.

---

[33] The Relator believes the name of one of the nurses is Sam Corcoran.

a. Patient 1 is an 18-year-old Tufts Health Plan (Medicaid replacement) patient who visited the Worcester Lincoln facility on 10/18/2016.

b. Patient 1 was a new patient and had no chronic illnesses.

c. Patient 1 presented with a chief complaint of a "cough." She reported that she had a harsh, worsening cough that has lasted about three weeks, accompanied with pain and post nasal drip. She did not have a fever, chills, chest pain, heartburn, nausea, vomiting, edema, agitation, wheezing or shortness of breath. Patient 1 is not a smoker and does not have asthma.

d. During that visit, Patient 1 had fourteen (14) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, psychiatric, endocrine, hematologic/lymphatic and allergic/immunologic.

e. In addition, patient 1 had ten (10) organ systems examined[34] during the visit, including: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, neck, lungs, cardiovascular, musculoskeletal and neurologic.

f. Patient 1 also had a chest x-ray done and was diagnosed with a cough.

g. Patient 1 was prescribed Azithromycin and a ProAir aerosol inhaler for her symptoms.

h. The Relator coded the visit as a level 3 for new patients, CPT code 99203.

---

[34] The review of systems can be performed by the nurses/medical assistants at the CareWell facilities. The physical examination must be performed by the physician/nurse practitioner treating the patient.

*United States ex rel. Aileen Cartier v. CareWell Urgent Care Centers of MA P.C. et al.*
FEDERAL FALSE CLAIMS ACT AMENDED COMPLAINT
**FILED UNDER SEAL**

i.  Approximately three hours after the visit, Nicole Troy ("ntroy2"), the Practice
    Manager at Worcester Lincoln, changed the procedure code from 99203 to 99204,
    thereby upcoding the visit to a new patient level 4.

j.  Three days later, on 10/21/2016, biller "ggupta4" added a Modifier -25 to the CPT
    code for the visit. No clinical justification was given.

k.  The Relator saw that the visit was fraudulently upcoded from a level 3 (99203) to a
    level 4 (99204) because Patient 1 presented with a simple/limited chief complaint of a
    cough and no comorbidities. As such, a complete review of systems was not
    medically necessary and was only performed to meet the Defendants' mandates.
    Based on her training and experience, the Relator knew that a patient with a chief
    complaint of a cough and no additional symptoms should have received an extended
    review of systems, where only five (5) systems are reviewed (constitutional, eyes,
    ears/nose/mouth/throat, respiratory, and cardiovascular).

l.  Further, the patient received a medically unnecessary physical examination pursuant
    to the Defendants' mandates, beyond what was clinically required for her condition.
    Based on her training and experience, the Relator knew that the patient should have
    received a detailed examination, where only six (6) organ systems are examined
    (constitutional, eyes, head, ears/nose/mouth/throat, respiratory, and cardiovascular).

m.  In addition, the Relator states that the complexity of the medical decision making for
    this patient visit was low.

n.  No clinical reasoning or support was used in determining the level of history and
    physical examination performed and documented for the patient. With no necessity

for a complete review of systems and no need for a comprehensive exam, the encounter does not meet the requirements for a level 4 visit (99204).

o. In addition, the Relator observed that the addition of a Modifier -25 was also fraudulent because a chest x-ray was associated with the patient's chief complaint and part of the routine protocol to determine the patient's diagnosis. As such, the chest x-ray was not a separately identifiable service.

**Patient Two**

103. Relator Cartier has specific and independent knowledge that Patient 2 received a medically unnecessary review of systems and physical examination, which resulted in the visit being fraudulently upcoded.

a. Patient 2 is a 17-year-old Blue Cross Blue Shields of Massachusetts (primary insurance) and Massachusetts Medicaid (secondary insurance) patient who visited the Worcester Greenwood facility on 10/14/2016.

b. Patient 2 was a new patient with no chronic illnesses.

c. Patient 2 presented with a chief complaint of "earache, sore throat." He reported that he had a worsening pain of 7/10 in his throat, accompanied by difficulty swallowing and hoarseness that started the previous day. He did not have a fever, chest pain, abdominal pain, or nausea/vomiting/diarrhea.

d. During that visit, Patient 2 had eleven (11) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, and endocrine.

e. In addition, the patient had ten (10) organ systems examined during the visit, including: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, neck, lungs, cardiovascular, musculoskeletal, and neurologic.

f. Patient 2 also had a rapid strep throat test done and was diagnosed with otitis media (middle ear infection) and pain in the throat.

g. Patient 2 was prescribed Amoxicillin.

h. The Relator coded the visit as a level 3 for new patients, CPT code 99203.

i. Three days later, on 10/17/2016, biller "ggupta4" changed the procedure code from 99203 to 99204, thereby upcoding the visit to a level 4 for new patients.

j. The Relator saw that the visit was fraudulently upcoded from a level 3 (99203) to a level 4 (99204) because the patient presented with an uncomplicated complaint and no comorbidities. As such, a complete review of systems was not medically necessary and was only performed to meet the Defendants' mandates. Based on her training and experience, the Relator knew that a patient in Patient 2's condition should have received an extended review of systems, where only five (5) systems are reviewed (constitutional, eyes, ears/nose/mouth/throat, respiratory, cardiovascular).

k. Further, the patient received a medically unnecessary physical examination pursuant to the Defendants' mandates, beyond what was clinically required for his condition. Based on her training and experience, the Relator knew that the patient should have received a detailed exam, where only six (6) organ systems are examined (constitutional, head, eyes, ears/nose/mouth/throat, lung, cardiovascular).

l. In addition, the Relator states that the complexity of medical decision-making for this visit was low.

m. No clinical reasoning or support was used in determining the level of history and physical examination performed and documented for the patient. With no necessity for a complete review of systems and no need for a comprehensive exam, the encounter does not meet the requirements for a level 4 visit (99204).

**Patient Three**

104.    Relator Cartier has specific and independent knowledge that Patient 3 received a medically unnecessary review of systems and physical examination, which resulted in the visit being fraudulently upcoded.

a. Patient 3 is a 28-year-old Tufts Health Plan (Medicaid replacement) patient who visited the Cambridge Inman facility on 10/17/2016.

b. Patient 3 was a new patient whose past medical history includes hypothyroidism.

c. Patient 3 presented with a chief complaint of a "rash." She reported a red, itchy rash on her hands and groin which started two (2) weeks prior to the visit. She explained that she works in the food industry and "has been using new powdered gloves. She has since discontinued use of them. Symptoms have gotten better but have not resolved." The patient reported having taken Benadryl.

d. During that visit, Patient 3 had eleven (11) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, and endocrine.

e. In addition, the patient had eleven (11) organ systems examined during the visit, including: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, neck, lungs, cardiovascular, musculoskeletal, neurologic and skin.

f. Patient 3 was diagnosed with contact dermatitis and was prescribed Clobetasol creme and Desonide creme.

g. The Relator coded the visit as a level 3 for new patients, CPT code 99203.

h. Two days later, on 10/19/2016, biller "ddhokai" changed the procedure code from 99203 to 99204, thereby upcoding the visit to a level 4 for new patients.

i. The Relator saw that the visit was fraudulently upcoded from a level 3 (99203) to a level 4 (99204) because the patient presented with an uncomplicated complaint so a complete review of systems was not medically necessary. It was only performed to meet the Defendants' mandates. Based on her training and experience, the Relator knew that a patient with a chief complaint of a rash and no other symptoms should have received an extended review of systems, where only four (4) systems are reviewed (constitutional, ears/nose/mouth/throat, respiratory, skin).

j. Further, the patient received a medically unnecessary physical examination pursuant to the Defendants' mandates, beyond what was clinically required for her condition. Based on her training and experience, the Relator knew that the patient should have received a detailed examination, where only five (5) organ systems are examined (constitutional, ears/nose/mouth/throat, head, respiratory, skin).

k. In addition, the Relator states that the complexity of medical decision-making for this visit was low.

l. No clinical reasoning or support was used in determining the level of history and physical examination performed and documented for the patient. With no necessity for a complete review of systems and no need for a comprehensive exam, the encounter does not meet the requirements for a level 4 visit (99204).

**Patient Four**

105.  Relator Cartier has specific and independent knowledge that Patient 4 received a medically unnecessary review of systems and physical examination, which resulted in the visit being fraudulently upcoded.

   a.  Patient 4 is an 18-year-old Tufts Health Plan (Medicaid replacement) patient who visited the Worcester Greenwood facility on 10/14/2016.

   b.  Patient 4 was an established patient whose past medical history includes anxiety and depression.

   c.  Patient 4 presented with a chief complaint of "right back pain." She reported that she had a sharp, 7/10 pain with movement that started the previous day while she was working out. No injuries were noted.

   m.  During that visit, Patient 4 had fourteen (14) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, psychiatric, endocrine, hematologic/lymphatic and allergic/immunologic.

   n.  In addition, the patient had thirteen (13) organ systems examined during the visit, including: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, neck, lungs, cardiovascular, abdomen, musculoskeletal, neurologic, skin, and back.

o.  Patient 4 was diagnosed with backache ("Dorsalgia, unspecified") and was prescribed Cyclobenzaprine and Ibuprofen.

p.  The Relator coded the visit as a level 3 for established patients, CPT code 99213.

q.  The next day, on 10/15/2016, biller "ddhokai" changed the procedure code from 99213 to 99214, thereby upcoding the visit to a level 4 for established patients.

r.  The Relator states that the visit was fraudulently upcoded from a level 3 (99213) to a level 4 (99214) because the patient presented with an uncomplicated chief complaint and no comorbidities. As such, a complete review of systems was not medically necessary and was only performed to meet the Defendants' mandates. Based on her training and experience, the Relator knew that a patient with a chief complaint of back pain and no other symptoms should have received an extended review of systems, where only four (4) systems are reviewed (constitutional, genitourinary, skin, musculoskeletal).

s.  Further, the patient received a medically unnecessary physical examination pursuant to the Defendants' mandates, beyond what was clinically required for her condition. Based on her training and experience, the Relator knew that the patient should have received an expanded problem focused examination, where only four (4) organ systems are examined (constitutional, genitourinary, musculoskeletal, skin).

t.  In addition, the Relator states that the complexity of medical decision-making for this visit was low.

u.  No clinical reasoning or support was used in determining the level of history and physical examination performed and documented for the patient. With no necessity

for a complete review of systems and no need for a comprehensive exam, the encounter does not meet the requirements for a level 4 visit (99214).

**Patient Five**

106.    Relator Cartier has specific and independent knowledge that Patient 5 received a medically unnecessary review of systems and physical examination, which resulted in the visit being fraudulently upcoded.

    a.  Patient 5 is a 16-year-old Medicaid of Massachusetts patient who visited the Worcester Lincoln facility on 10/18/2016.

    b.  Patient 5 was a new patient whose past medical history includes anxiety.

    c.  Patient 5 presented with a chief complaint of "earache." The patient reported that she had a throbbing, sharp pain on her right ear that started a week prior to the visit. She stated that she had missed two days of school due to the worsening pain but described her pain level during the visit as 2/10. She added that it hurts to chew, yawn, blow nose, or to lie on and pull on the ear. She did not have hearing loss, nose or sinus problems, no popping/ringing in the ears. The patient did not have a fever or other upper respiratory infection symptoms.

    d.  During that visit, Patient 5 had eleven (11) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, and endocrine.

e. In addition, the patient had ten (10) organ systems examined during the visit, including: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, neck, lungs, cardiovascular, musculoskeletal, and neurologic.

f. Patient 5 was diagnosed with otitis media (middle ear infection) and prescribed Amoxicillin.

g. The Relator coded the visit as a level 3 for new patients, CPT code 99203.

h. Two days after the visit, on 10/20/2016, biller "ddhokai" changed the procedure code from 99203 to 99204, thereby upcoding the visit to a level 4 for new patients.

i. The Relator states that the visit was fraudulently upcoded from a level 3 (99203) to a level 4 (99204) because the patient presented with a singular problem. As such, a complete review of systems was not medically necessary and was only performed to meet the Defendants' mandates. Based on her training and experience, the Relator knew that a patient with a chief complaint of an earache should have received an extended review of systems, where only five (5) systems are reviewed (constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory).

j. Further, the patient received a medically unnecessary physical examination pursuant to the Defendants' mandates, beyond what was clinically required for her condition. Based on her training and experience, the Relator knew that the patient should have received a detailed examination, where only six (6) organ

systems are examined (constitutional, eyes, ears/nose/mouth/throat, head, cardiovascular, respiratory).

k. In addition, the Relator states that the complexity of medical decision-making for this visit was low.

l. No clinical reasoning or support was used in determining the level of history and physical examination performed and documented for the patient. With no necessity for a complete review of systems and no need for a comprehensive exam, the encounter does not meet the requirements for a level 4 visit (99204).

**Patient Six**

107. Relator Cartier has specific and independent knowledge that Patient 6 received a medically unnecessary review of systems and physical examination, which resulted in the visit being fraudulently upcoded.

a. Patient 6 is a 46-year-old Neighborhood Health Plan of Massachusetts (Medicaid replacement) patient who visited the Cambridge Inman facility on 11/04/2016.

b. Patent 6 was a new patient with no chronic illnesses.

c. Patient 6 presented with a chief complaint of "dysuria (pain or discomfort when urinating)" that started on or about 10/31/2016. He stated that has experienced urgency for the last five days, and noticed a small amount of blood in his urine on 10/31/2016. The record states that he has a history of STDs (chlamydia and herpes).

d. During that visit, Patient 6 had eleven (11) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, and

endocrine.

e.  In addition, the patient had thirteen (13) organ systems examined during the visit: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, neck, lungs, cardiovascular, abdomen, male genitourinary (GU), musculoskeletal, neurologic and skin.

f.  Patent 6 also had a urinary dipstick test done. While the test results were pending, the patient was diagnosed with an urgent desire to urinate and high risk sexual behavior.

g.  Patient 6 was administered Ceftriaxone and prescribed Azithromycin.

h.  The Relator coded the visit as a level 3 for new patients, CPT code 99203.

i.  Later on, in the same day, "rgreg" changed the procedure code from 99203 to 99204, thereby upcoding the visit to a level 4 for new patients. "Rgreg" also added a modifier -25 to the CPT code.

j.  The Relator states that the visit was fraudulently upcoded from a level 3 (99203) to a level 4 (99204) because a complete review of systems was not medically necessary for diagnosing and treating the patient's presenting problems. It was only performed to meet the Defendants' mandates. Based on her training and experience, the Relator knew that a patient in Patient 6's condition should have received an extended review of systems, where only four (4) systems are reviewed (constitutional, gastrointestinal, genitourinary, skin).

k.  Further, the patient received a medically unnecessary physical examination pursuant to the Defendants' mandates, beyond what was clinically required for his condition. Based on her training and experience, the Relator knew that the patient should have

received an expanded problem focused examination, where only four (4) organ systems are examined (constitutional, skin, genitourinary, abdomen).

l.   In addition, the Relator states that the complexity of medical decision-making for this visit was moderate.

m.   No clinical reasoning or support was used in determining the level of history and physical examination performed and documented for the patient. With no necessity for a complete review of systems and no need for a comprehensive exam, the encounter does not meet the requirements for a level 4 visit (99204).

**Patient Seven**

108.   Relator Cartier has specific and independent knowledge that Patient 7 received a medically unnecessary review of systems and physical examination, which resulted in the visit being fraudulently upcoded.

a.   Patient 7 is a 32-year-old Tufts Public Health Plan patient who visited the Northborough facility on 10/11/2016.

b.   Patient 7 was a new patient with herpes simplex virus (HSV).

c.   Patient 7 presented with a chief complaint of a "rash." The patient stated that her bilateral ankle rash which started less than one week prior to the date of the visit. She described the rash as itchy and not painful.

d.   During that visit, Patient 7 had twelve (12) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, endocrine, and allergic/immunologic.

e. In addition, the patient had eleven (11) organ systems examined during the visit, including: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, neck, lungs, cardiovascular, musculoskeletal, neurologic and skin.

f. Patient 7 was diagnosed with an insect bite and was recommended to use Benadryl, an over the counter drug.

g. The Relator coded the visit as a level 2 for new patients, CPT code 99202.

h. Later on, in the same day, Alyssa Ashley-High ("aashleyhigh"), Practice Manager at the Northborough facility, changed the procedure code from 99202 to 99203, thereby upcoding the visit to a level 3 for new patients.

i. The Relator states that the visit was fraudulently upcoded from a level 2 (99202) to a level 3 (99203) because the patient presented with a limited problem so a complete review of systems was not medically necessary. It was only performed to meet the Defendants' mandates. Based on her training and experience, the Relator knew that a patient with a chief complaint of a rash and no other symptoms should have received an extended review of systems, where only four (4) systems are reviewed (constitutional, ears/nose/mouth/throat, respiratory, skin).

j. Further, the patient received a medically unnecessary physical examination pursuant to the Defendants' mandates, beyond what was clinically required for her condition. Based on her training and experience, the Relator knew that the patient should have received an expanded problem focused examination, where only two (2) organ systems are examined (constitutional, skin).

k. In addition, the Relator states that the complexity of medical decision-making for this visit was low.

l. No clinical reasoning or support was used in determining the level of history and physical examination performed and documented for the patient. With no necessity for a complete review of systems and no need for a comprehensive exam, the encounter does not meet the requirements for a level 3 visit (99203).

**Patient Eight**

109. Relator Cartier has specific and independent knowledge that Patient 8 received a medically unnecessary review of systems and physical examination, which resulted in the visit being fraudulently upcoded.

a. Patient 8 is a 35-year-old Neighborhood Health Plan of Massachusetts (Medicaid replacement) patient who visited the Worcester Greenwood facility on 10/14/2016.

b. Patient 8 was an established patient whose past medical history "GI (*gastrointestinal*) issues."

c. This was a follow-up visit for "injury of ankle." Patient 8 reported she injured her ankle a month ago. She stated that she was seen at the CareWell Lincoln facility where she had an x-ray done. The results had come back negative, so the patient was recommended to take Tylenol.

d. However, Patient 8's pain continued so she returned for another visit. She reported 8/10 worsening pain on her left ankle with throbbing during this visit. Her ankle was noted to be swollen. The patient was able to walk and has a history

of plantar fasciitis (inflammation of a thick band of tissue that connects the heel bone to the toes).

e. During this visit, Patient 8 had eleven (11) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, and endocrine.

f. In addition, the patient had ten (10) organ systems examined during the visit, including: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, neck, lungs, cardiovascular, musculoskeletal, neurologic, and skin.

g. Patient 8 was diagnosed with "arthralgia of the ankle and/or feet" and was not prescribed any medications.

h. The Relator coded the visit as a level 3 for established patients, CPT code 99213.

i. Approximately three days later, biller "ddhokai" changed the procedure code from 99213 to 99214, thereby upcoding the visit to a level 4 for established patients.

j. The Relator states that the visit was fraudulently upcoded from a level 3 (99213) to a level 4 (99214) because the patient presented with a focused, uncomplicated complaint so a complete review of systems was not medically necessary. It was only performed to meet the Defendants' mandates. Based on her training and experience, the Relator knew that a patient in Patient 8's condition should have received an extended review of systems, where only two (2) systems are reviewed (constitutional, musculoskeletal).

k. Further, the patient received a medically unnecessary physical examination pursuant to the Defendants' mandates, beyond what was clinically required for her condition. Based on her training and experience, the Relator knew that the patient should have received an expanded problem focused examination, where only two (2) organ systems are examined (constitutional, musculoskeletal).

l. In addition, the Relator states that the complexity of medical decision-making for this visit was low.

m. No clinical reasoning or support was used in determining the level of history and physical examination performed and documented for the patient. With no necessity for a complete review of systems and no need for a comprehensive exam, the encounter does not meet the requirements for a level 4 visit (99214).

**Patient Nine**

110.    Relator Cartier has specific and independent knowledge that Patient 9 received a medically unnecessary review of systems and physical examination, which resulted in the visit being fraudulently upcoded.

a. Patient 9 is a 57-year-old CeltiCare Health Plan of Massachusetts (Medicaid replacement) patient who visited the Worcester Greenwood facility on 10/14/2016.

b. Patient 9 was a new patient whose past medical history includes arthritis.

c. Patient 9 presented with a chief complaint of "sore throat...also sore tongue for 2 days." She reported that she has had worsening throat pain with difficulty

swallowing, which started three days prior to the visit. The patient described the symptoms as being "worse during the day."

d. During that visit, Patient 9 had eleven (11) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, and endocrine.

e. In addition, the patient had eleven (11) organ systems examined during the visit, including: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, neck, lungs, cardiovascular, musculoskeletal, neurologic, and skin.

f. Patient 9 also had a rapid strep throat test done and was diagnosed with pain in the throat and dental abscess.

g. Patient 9 was prescribed Augmentin.

h. The Relator coded the visit as a level 3 for new patients, CPT code 99203.

i. Three days later, on 10/17/2016, biller "ggupta4" changed the procedure code from 99203 to 99204, thereby upcoding the visit to a level 4 for new patients.

j. The Relator states that the visit was fraudulently upcoded from a level 3 (99203) to a level 4 (99204) because the patient presented with a focused, uncomplicated complaint so a complete review of systems was not medically necessary. It was only performed to meet the Defendants' mandates. Based on her training and experience, the Relator knew that a patient in Patient 9's condition should have received an extended review of systems, where only five (5) systems are reviewed (constitutional, eyes, ears/nose/mouth/throat, lungs, cardiovascular).

k. Further, the patient received a medically unnecessary physical examination pursuant to the Defendants' mandates, beyond what was clinically required for her condition. Based on her training and experience, the Relator knew that the patient should have received a detailed examination, where only six (6) organ systems are examined (constitutional, eyes, ears/nose/mouth/throat, lungs, cardiovascular, head).

l. In addition, the Relator states that the complexity of medical decision-making for this visit was low.

m. No clinical reasoning or support was used in determining the level of history and physical examination performed and documented for the patient. With no necessity for a complete review of systems and no need for a comprehensive exam, the encounter does not meet the requirements for a level 4 visit (99204).

111. These patient examples are representative of the Defendants' practices. There are many more examples of the foregoing.

C. Billing for higher levels of E/M services than were actually documented to have been delivered to the patients and without meeting the definition of the CPT code billed

112. The Defendants billed Medicare and Medicaid for higher levels of evaluation and management services than were documented to have been delivered to the patients. As described in paragraph 42 herein, the level of service to be billed for a visit is primarily determined by three components—documentation of the patients' history, documentation of the physical examination, and complexity of the medical decision-making. Per Medicare regulations, specific

requirements must be met within each component[35]. In addition, according to CareWell's Level 4 Reference card, two of the three key components must be documented for established patient visits and all three key components must be documented for new patient visits. The patient records clearly show that the Defendants billed for a service level without meeting the requirements for each component used in determining the appropriate CPT code. The Defendants billed a new patient visit as a level 4 although the patient did not have ten (10) body systems reviewed and/or at least nine (9) body systems examined. *See* patient examples 10, 11 and 12 below. This is contrary to Medicare regulations which state that "to bill the highest levels of visit codes, the services furnished must meet the definition of the code." *See* paragraph 58 herein. Although the patients included below are not necessarily Medicare/Medicaid patients, the Relator states that the Defendants' protocol indicates by inference that this wrongdoing occurred with Medicare and Medicaid patients as well.

**Patient Examples**

113.    By way of illustration, the following are examples of patients who did not meet the Defendants own documentation requirements for the level of service billed for the visit.

**Patient Ten**

114.    Relator Cartier has specific and independent knowledge that Patient 10's visit was fraudulently upcoded without meeting the documentation requirements for the higher E/M level billed.

a.    Patient 10 is an 18-year-old Blue Cross Blue Shields of Connecticut patient who visited the Worcester Greenwood facility on 10/29/2016.

---

[35] *See* paragraphs 44-56 herein.

b. Patient 10 was a new patient with no chronic illnesses.

c. Patient 10 presented with a chief complaint of "right foot pain." She reported that she had 8/10 ache with weight bearing on her foot accompanied by swelling, redness and ecchymosis. She stated the pain started the previous day.

d. During that visit, Patient 10 had three (3) systems reviewed, including: constitutional, musculoskeletal, and integumentary.

e. In addition, the patient had six (6) organ systems examined during the visit, including: constitutional, psychiatric, head, musculoskeletal, neurologic and skin.

f. Patient 10 also had a foot x-ray done and was diagnosed with pain and fracture of the right foot. No prescriptions were given.

g. The Relator coded the visit as a level 3 for new patients, CPT code 99203.

h. Later on, in the same day, Ryan Sadlier "rsadlier2" changed the procedure code from 99203 to 99204, thereby upcoding the visit to a level 4 for new patients.

i. The Relator states that the visit was fraudulently upcoded from a level 3 (99203) to a level 4 (99204) because Patient 14's visit did not meet the documentation requirements for a level 4 visit.

j. The patient records show that the patient only had three (3) systems reviewed, instead of the ten (10) systems that must be reviewed for a level 4 new patient visit.

k. In addition, the patient had six (6) organ systems examined, instead of nine[36] (9) required for a level 4 new patient visit.

_____

[36] This is in accordance with the *1997 Documentation Guidelines for Evaluation and Management Services*. The 1995 version of the guidelines requires that eight (8) systems be examined and documented.

l. All three components (history, examination, and medical decision-making) must be met for CPT code 99204. Because the patient did not meet the documentation requirements for the history and physical examination components of the E/M service level 4, the visit was wrongfully billed.

**Patient Eleven**

115. Relator Cartier has specific and independent knowledge that Patient 11's visit was fraudulently upcoded without meeting the documentation requirements for the higher E/M level billed.

    a. Patient 11 is a 55-year-old Blue Cross Blue Shields of Massachusetts patient who visited the Cambridge Inman facility on 10/21/2016.

    b. Patient 11 was one of the four patients listed in Mr. Kelliehan's 10/26/2016 email for having an "insufficient ROS (review of systems)."

    c. Patient 11 was a new patient whose past medical history includes hypothyroidism. She presented with a chief complaint of "red eye." She reported that she had 3/10 pain that started two nights prior to the visit. The patient stated she has had exposure to "pink eye" and has had no relief using eye drops. The record states the patient had normal vision.

    d. During that visit, patient 11 had five (5) systems reviewed, including: constitutional, eyes, ears/nose/mouth/throat, cardiovascular and respiratory.

    e. In addition, the patient had nine (9) organ systems examined during the visit, including: constitutional, psychiatric, head, eyes, ear/nose/mouth/throat, lungs, cardiovascular, musculoskeletal, and neurologic.

f. Patient 11 was diagnosed with conjunctivitis and prescribed Polytrim.

g. The Relator coded the visit as a level 2 for new patients, CPT code 99202.

h. Four days later, on 10/25/2016, Courtney Kellichan ("ckelliehan"), Practice Manager at the Cambridge Inman facility, changed the procedure code from 99202 to 99203, thereby upcoding the visit to a level 3 for new patients.

i. Five days after Mr. Kellichan's change, and ten days after the visit, on 10/31/2016, biller "ggupta4" changed the procedure code from 99203 to 99204, thereby upcoding the visit to a level 4 for new patients.

j. The Relator states that the visit was fraudulently upcoded from a level 2 (99202) to a level 4 (99204) because Patient 11's visit did not meet the documentation requirements for a level 4 visit.

k. The patient records show that the patient only had five (5) systems reviewed, instead of the ten (10) systems that must be reviewed for a level 4 new patient visit.

l. All three components (history, examination, and medical decision-making) must be met for CPT code 99204. Because the patient did not meet the documentation requirements for the history component of the E/M service level 4, the visit was wrongfully billed.

**Patient Twelve**

116. Relator Cartier has specific and independent knowledge that Patient 12's visit was fraudulently upcoded without meeting the documentation requirements for the higher E/M level billed.

a. Patient 12 is a 24-year-old United Healthcare patient who visited the Cambridge Inman facility on 10/21/2016.

b. Patient 12 was one of the four patients listed in Courtney Kellichan's 10/26/2016 email for having an "insufficient ROS (review of systems)."

c. Patient 12 was a new patient whose past medical history includes asthma as a child. He presented with a chief complaint of a "rash." The patient reported that has had a rash by his left ankle for the past six (6) days.

d. During that visit, Patient 12 had five (5) systems reviewed, including: constitutional, musculoskeletal, integumentary, neurologic, and endocrine.

e. In addition, the patient had nine (9) organ systems examined during the visit, including: constitutional, psychiatric, head, neck, lungs, cardiovascular, musculoskeletal, neurologic, and skin.

f. Patient 12 was diagnosed with cellulitis and prescribed Bactrim and Bactroban.

g. The Relator coded the visit as a level 3 for new patients, CPT code 99203.

h. Ten days after the visit, on 10/31/2016, biller "ggupta4" changed the procedure code from 99203 to 99204, thereby upcoding the visit to a level 4 for new patients.

i. The Relator states that the visit was fraudulently upcoded from a level 3 (99203) to a level 4 (99204) because patient 16's visit did not meet the documentation requirements for a level 4 visit.

j. The patient records show that the patient only had five (5) systems reviewed, instead of the ten (10) systems that must be reviewed for a level 4 new patient visit.

k. All three components (history, examination, and medical decision-making) must be met for CPT code 99204. Because the patient did not meet the documentation requirements for the history component of the E/M service level 4, the visit was wrongfully billed.

117. These patient examples are representative of the Defendants' practices. There are many more examples of the foregoing.

D. Adding a Modifier -25 to patients whose condition does **not** require a "significant, separately identifiable" evaluation and management service

118. Medicare requires that Current Procedural Terminology (CPT) modifier -25 "be appended to the medically necessary E/M service identifying this service as a significant, separately identifiable service…and only when these services are provided by the same physician (or same qualified non-physician practitioner) to the same patient on the same day as another procedure or other service… above and beyond the usual pre- and post-operative work of the procedure." However, the Defendants add a Modifier -25 to services that are not "significant, separately identifiable" evaluation and management service above and beyond the care usually associated with the procedure. The Defendants add a Modifier -25 to laboratory tests and x-rays, even when such services are part of the routine protocol for the type of visit required by the patients. The patient records show that the Modifier -25 is appended to claims by the facilities Practice Managers, Market Leaders, or the third-party billing company personnel.

119.    An example of the appropriate use of the Modifier -25 is the following: if a patient present with a chief complaint of right ankle pain, the physician/nurse practitioner treating the patient may perform an x-ray in order to properly diagnose the patient. If the x-ray shows that the patient has a broken ankle, the treating physician or nurse practitioner might place an ortho glass[37] on the patient. When coding the visit, a Modifier -25 would be appropriately added to the CPT code for the placement of the ortho glass because this was a significant and separately identifiable procedure. However, the addition of a Modifier -25 would be inappropriate for the x-ray, because the x-ray was associated with patient's chief complaint and part of the routine protocol to determine the patient's diagnosis. In this example, the x-ray is not a separately identifiable procedure.

## Patient Examples

120.    By way of illustration, the following are examples of patients whose services were billed with an inappropriate Modifier -25.

**Patient One**

121.    Relator Cartier has specific and independent knowledge that a Modifier -25 was inappropriately appended to the CPT code billed for Patient 1's visit.

   a.  As described in paragraph 102 herein, patient 1 is an 18-year-old Tufts Health Plan (Medicaid replacement) patient who visited the Worcester Lincoln facility on 10/18/2016.

   b.  Patient 1 was a new patient and had no chronic illnesses.

   c.  Patient 1 reported that she had a harsh, worsening cough that lasted about three

---

[37] An ortho glass is a splinting system.

weeks, accompanied with pain and post nasal drip.

d. As part of the visit, Patient 1 also had a chest x-ray done and was diagnosed with a cough.

e. Patient 1 was prescribed Azithromycin and a ProAir aerosol inhaler for her symptoms.

f. The Relator coded the visit as a 99203.

g. Nicole Troy ("ntroy2"), the Practice Manager at Worcester Lincoln upcoded the visit to a 99204.

h. Three days later, on 10/21/2016, biller "ggupta4" added a Modifier -25 to the CPT code for the visit. No clinical justification was given.

i. The Relator states that the addition of a Modifier -25 was inappropriate because the chest x-ray was associated with patient's chief complaint and part of the routine protocol to determine the patient's diagnosis. The Relator explains that s chest x-ray for a patient who has been coughing for three (3) weeks is an entirely reasonable tool for the diagnosis and treatment of the patient and was performed to ensure that the patient did not have pneumonia. As such, the x-ray was not a separately identifiable E/M service warranting the use of a Modifier -25.

**Patient Thirteen**

122.    Relator Cartier has specific and independent knowledge that a Modifier -25 was inappropriately appended to the CPT code billed for Patient 13's visit.

a. Patient 13 is a 16-year-old Tufts Public Health Plan (Medicaid replacement) patient who visited the Worcester Lincoln facility on 10/18/2016.

b. Patient 13 was a new patient with no chronic illnesses.

c. Patient 13 presented with a chief complaint of "left arm pain/injury." He reported that he had 7/10 pain and numbness in the left elbow/forearm caused by a sports related injury the previous day. The patient was tackled during a football game.

d. As part of the visit, Patient 13 had an x-ray done.

e. The Relator coded the visit a level 3 for new patients, CPT code 99203, without a modifier.

f. Three days later, on 10/21/2016, biller "ggupta4" added a Modifier -25 to the CPT code.

g. The Relator states that the addition of the Modifier -25 to the CPT code was inappropriate for this visit. The Relator explains that the x-ray was associated with the patient's chief complaint and required in order to assess the patient's main problem. The Relator explains that given the degree of discomfort and numbness, as well as the mechanism of injury, it was reasonable to perform an x-ray to evaluate the fracture/dislocation. As such, the x-ray was not a separately identifiable service warranting the use of a Modifier-25.

**Patient Fourteen**

123. Relator Cartier has specific and independent knowledge that a Modifier -25 was inappropriately appended to the CPT code billed for Patient 14's visit.

a. Patient 14 is a 13-year-old Blue Cross Blue Shields of Massachusetts (Medicaid replacement) patient who visited the Worcester Lincoln facility on 10/18/2016.

b. Patient 14 was a new patient with no chronic illnesses.

c.  Patient 14 presented with a chief complaint of "left wrist pain." He reported sharp pain, swelling and throbbing on his left wrist caused by a sports related injury the previous day. The patient stated that he had fallen on his left hand while playing soccer.

d.  As part of the visit, the patient had a wrist x-ray done.

e.  The level coded by the Relator does not appear under the Audit History section of the Billing tab.

f.  Three days after the visit, on 10/21/2016, biller "ggupta4" coded the visit as 99203, level 3 for new patients, and added a Modifier -25.

g.  The Relator states that the addition of the Modifier -25 to the CPT code was inappropriate for this visit. The Relator states that the x-ray was associated with the patient's chief complaint and required in order to assess the patient's main problem. The Relator explains that, given the degree of discomfort, as well as the mechanism of injury, it is reasonable to perform an x-ray to evaluate the fracture/dislocation. As such, the x-ray was not a separately identifiable service warranting the use of a Modifier-25.

**Patient Fifteen**

124.  Relator Cartier has specific and independent knowledge that a Modifier -25 was inappropriately appended to the CPT code billed for Patient 15's visit.

a.  Patient 15 is an 82-year-old Medicare patient who visited the Northborough facility on 10/11/2016.

b.  Patient 15 was an established patient whose past medical history includes cholesterol

and hypertension.

c. Patient 15 presented with a chief complaint of "right shoulder pain." He reported that he fell and has had 8/10 pain on his shoulder for the past four weeks. He explained that the pain occurs when he raises his hand over his head. The patient also stated that he was experiencing weakness.

d. As part of the visit, the patient had a shoulder x-ray done.

e. The Relator coded the visit as 99214, level 4 for established patients, without a modifier.

f. The next day, "rgreg" added a Modifier -25 to the CPT code.

j. The Relator states that the addition of the Modifier -25 to the CPT code was inappropriate for this visit. The Relator explains that the x-ray was associated with the patient's chief complaint and required in order to assess the patient's main problem. The Relator explains that, given the degree of discomfort, weakness, and the mechanism of injury, it was reasonable to perform an x-ray to evaluate the fracture/dislocation. As such, the x-ray was not a separately identifiable service warranting the use of a Modifier-25.

125.   These patient examples are representative of the Defendants' practices. There are many more examples of the foregoing.

## X.    CAREWELL'S RELATIONSHIP WITH OTHER COMPANIES

### A. Lahey Health

126.   CareWell Urgent Care announced its partnership with Lahey Health on January 31, 2014. CareWell's affiliation with Lahey Health launched a mutually beneficial and

collaborative relationship that increases access to healthcare, with both organizations referring patients based on their needs. Under the new partnership, CareWell clinics are able to refer patients to Lahey Health specialists and hospitals when necessary. Lahey Health's hospitals, conversely, can refer appropriate patients to nearby CareWell centers, reducing wait times and costs for non-urgent patients.

### B. Mount Auburn Hospital

127.    Mount Auburn Hospital announced its affiliation with CareWell Urgent Care on October 6, 2016. The affiliation will provide patients in Cambridge, MA and surrounding areas an integrated healthcare solution with both organizations referring patients based on their needs. CareWell patients have easy access to Mount Auburn Hospital specialists when necessary. In turn, Mount Auburn Hospital patients have access to urgent care services, reducing wait times and costs for non-urgent patients. With the patient's permission, CareWell forwards x-rays, lab results and diagnostic notes to Mount Auburn Hospital doctors within hours of a visit.

## XI.  PERIOD OF TIME FRAUD HAS OCCURED

128.    Relator Cartier alleges that CareWell has engaged in some or all of these schemes at all its urgent care facilities for the past three (3) years, since Dr. John Cornwell assumed control of the company in 2013. The Relator states that Dr. Cornwell, in his role as President and Medical Director of the Massachusetts facilities, constantly applies direct pressure to the employees to meet the company's mandates. The Relator states that Dr. Cornwell instituted the fraudulent practices and mandates as described herein and continues to implement them rigidly across all facilities.

129.     Relator Cartier began working as a per-diem Nurse Practitioner for CareWell in May of 2016 and became a full-time employee in July of 2016. Notwithstanding, the Relator learned that CareWell has engaged in some or all of these schemes at all its urgent care facilities for a while. The Relator states that the Defendants are highly organized in the way they implement the procedures and ensure that the mandates are met. This indicates to the Relator that the mandates were not recently implemented, but rather have been practiced for a long time.

130.     In her role as the sole Nurse Practitioner in a given urgent care facility, the Relator does not work directly with fellow physicians. However, the Relator does follow-up on patients treated by other providers at the different CareWell facilities. For instance, when the test results of a patient treated by another physician come in, the Relator can interpret the results (be it laboratory tests or x-rays) and/or record them into the patient's profile. In doing so, the Relator has noticed that physicians working at the different CareWell urgent care centers are engaging in the same practices the Defendants mandate that the Relator follow. The Relator states that the physicians have worked for CareWell longer than she has. This indicated to the Relator that the wrongdoing is not limited to a single urgent care facility, but rather it is standard throughout the seventeen (17) facilities and has been practiced for a long time.

## XII.     FACTS RELATING TO COUNT III RETALIATION UNDER 31 U.S.C. SEC. 3730(h) AND M.G.L. C. 12 § 5J

131.     On September 22, 2016, in direct response to her refusal to comply with the fraudulent practices engaged by the Defendants, Relator Cartier was to subjected to threats, intimidation and coercion. Among other things, she was the recipient of several emails effectively threatening termination if she did not comply with the fraudulent schemes and she was also the recipient of phone calls with similar and consistent verbal "pressure" to engage in

the practices which she was attempting to stop. For example, as described in paragraph 96

herein, Relator Cartier received a phone call from Dr. John Cornwell on 09/22/2016 regarding

her billing practices. Dr. Cornwell told the Relator that he was going through her patient charts in

real time and that she was consistently billing at an incorrect rate. He said: "They should be level

4 visits and you are coding at level 3. If you do not bill at a level 4, it would be a deal breaker. It

doesn't even cost the patient more money. This is the second time I am speaking to you about

this and I need you to change your behavior."

### COUNT I: FALSE OR FRAUDULENT CLAIMS
### (31 U.S.C. Sec. 3729(a)(1)(A), M.G.L. C. 12, §5B, AND R.I. GEN. LAWS § 9-1.1-3)

132.    The Plaintiff Relator repeats and re-alleges each allegation in each of the

preceding paragraphs as if fully set forth herein.

133.    During the period from March 2013 to the present day, the Defendants knowingly

caused the presentation of false or fraudulent claims for payment or approval, in violation of The

False Claims Act, 31 U.S.C. Sec. 3729(a)(1)(A), **M.G.L. C. 12 §5B, and R.I. Gen. Laws § 9-**

**1.1-3** specifically, claims for payment to Medicare and Medicaid for unreasonable, unnecessary,

or unskilled evaluation and management services, or for evaluation and management services

that were not provided.

134.    The Defendant CareWell certified that the claims were in fact necessary and

reasonable and the government relied on those statement and paid the fraudulent invoices.

135.    By virtue of the false or fraudulent claims Defendants knowingly caused to be

presented, the United States, the Commonwealth of Massachusetts, and the State of Rhode Island

have suffered actual damages and are entitled to recover treble damages plus a civil monetary

penalty for each false claim. The U.S. government, the Commonwealth of Massachusetts, and the State of Rhode Island, unaware of the falsity of the claims and/or statements and in reliance on the accuracy thereof, were damaged.

## COUNT II: FALSE STATEMENTS
### (31 U.S.C. Sec. 3729(a)(1)(B), M.G.L. CH. 12, § 5B, AND R.I. GEN. LAWS § 9-1.1-3)

136.    Plaintiff Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

137.    During the period from March 2013 to the present day, the Defendants knowingly made, used or caused to be made or used, false records or statements, including MDS forms, material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. Sec. 3729(a)(1)(B), M.G.L. C. 12, § 5B, and R.I. Gen. Laws § 9-1.1-3.

138.    The Defendant CareWell certified that the claims were in fact necessary and reasonable and the government relied on those statement and paid the fraudulent invoices.

139.    By virtue of the false records or statements Defendants made, used or caused to be made or used, the United States, the Commonwealth of Massachusetts, and the State of Rhode Island have suffered actual damages and are entitled to recover treble damages plus a civil monetary penalty for each false claim. The U.S. government, the Commonwealth of Massachusetts, and the State of Rhode Island, unaware of the falsity of the claims and/or statements and in reliance on the accuracy thereof, were damaged.

## COUNT III: RETALIATION V. CAREWELL
### (31 U.S.C. Sec 3730(h) AND M.G.L. C. 12, § 5J)

140.    The Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if full set forth herein.

141.    During the period of May 2016 to the present day, the Relator engaged in lawful acts and protected activity in furtherance of her efforts to stop more than one violations of the False Claims Act.

142.    On or about September 22, 2016 the Relator was harassed and threatened to be discharged from her employment by Defendant CareWell because of lawful acts done by her and her refusal to engage in fraudulent actions as hereinbefore described.

## PRAYER FOR RELIEF

WHEREFORE, the Relator demands and prays that judgment be entered in favor of the United States, the Commonwealth of Massachusetts, the State of Rhode Island and the Relator as follows:

143.    On Counts I & II, under the False Claims Act, for the amount of the United States', the Commonwealth of Massachusetts', and the State of Rhode Island's damages, trebled as required by law and such civil penalties as are required by, together with all relief as may be just and proper.

144.    That civil penalties of $11,500 be imposed for each and every false claim that the Defendants presented to the government entities herein.

145.    On Counts I & II, Attorneys fees and costs and as allowed by the False Claims Act, as well as pre- and post-judgement interest.

146.    On Count III, for special damages; litigation costs and attorney's fees as allowed by the FCA; and other damages for retaliation by the Defendants.

147.    All other relief as may be required or authorized by law in the interest of justice.

## DEMAND FOR JURY TRIAL

The Relator, on behalf of herself and the United States, the Commonwealth of Massachusetts, and the State of Rhode Island, demand a jury trial on all claims alleged herein.

Dated: January 12, 2017

Respectfully submitted,

The Relator Aileen Cartier
by her Counsel,

Jeffrey A. Newman, Esq.       1/12/17
Massachusetts BBO # 370450
Jeffrey Newman Law
One Story Terrace
Marblehead, Ma. 01945
Tel: 617-823-3217
Fax: 781-639-8688
Jeffrey@jeffreynewmanlaw.com